**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| TAKEDA PHARMACEUTICAL COMPANY LIMITED, and TAKEDA PHARMACEUTICALS U.S.A., INC.<br><br>*Plaintiffs*,<br><br>v.<br><br>NORWICH PHARMACEUTICALS, INC.<br><br>*Defendant*. | ) | C.A. No. 20-cv-8966-SRC-CLW<br><br>*Document Filed Electronically* |

**DEFENDANT NORWICH'S**
**RESPONSIVE CLAIM CONSTRUCTION BRIEF**

Arnold B. Calmann
Katherine A. Escanlar
**SAIBER LLC**
One Gateway Center, 9th Floor
Suite 950
Newark, NJ 07102
(973) 622-3333
acalmann@saiber.com
kescanlar@saiber.com

*Attorneys for Defendant Norwich Pharmaceuticals, Inc.*

Matthew J. Becker
Edward M. Mathias
Thomas K. Hedemann
**AXINN, VELTROP & HARKRIDER LLP**
90 State House Square
Hartford, CT 06103
(860) 275-8100
mbecker@axinn.com
tmathias@axinn.com
thedemann@axinn.com

Jason Murata
**AXINN, VELTROP & HARKRIDER LLP**
560 Mission Street
San Francisco, CA 94015
(415) 490-2000
jmurata@axinn.com

# TABLE OF CONTENTS


I. The Person of Ordinary Skill in the Art ....................1

II. Claim Construction of the Patents-in-Suit ....................2

A. The "Amphetamine" Terms (Terms 9, 9(a)-(i)) ....................2

B. "L-lysine-d-amphetamine Mesylate" / "Mesylate Salt of L-lysine-d-amphetamine" / "… Wherein Said Salt is a Mesylate Salt" (Term 1) ....................13

C. "Limited Bioavailability of Amphetamine when Administered through Alternative Routes of Administration" (Term 4) ....................19

D. "$C_{max}$ which Results in Euphoria" (Term 6) ....................23

E. "Isolated" (Term 14) ....................27

F. The Milligram Dosage Terms (without "about") (Terms 16, 17, 18, 19) ....................33

G. "About 30 mg" / "About 50 mg" / "About 70 mg" (Term 20) ....................38

III. Conclusion ....................40

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Boss Control, Inc. v. Bombardier Inc.*,
410 F.3d 1372 (Fed. Cir. 2005) ....................................................................8

*Braintree Labs., Inc. v. Novel Labs., Inc.*,
749 F.3d 1349 (Fed. Cir. 2014) ....................................................................8

*Cipla Ltd. v. Sunovion Pharms. Inc.*,
No. 15-cv-424-LPS, 2017 WL 2778352 (D. Del. June 27, 2017)......................33

*Impax Labs., Inc. v. Actavis Labs. FL, Inc.*,
No. 15-cv-6934 (SRC), 2017 WL 1900726 (D.N.J. May 9, 2017) ....................39

*Mannatech, Inc. v. Glycobiotics Int'l, Inc.*,
513 F. Supp. 2d 754 (N.D. Tex. 2007) ..........................................................33

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
579 F.3d 1363 (Fed. Cir. 2009) ....................................................................7

*Merck & Co. v. Teva Pharms. USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005) ....................................................................39

*Nestle USA, Inc. v. Steuben Foods, Inc.*,
686 F. App'x 917 (Fed. Cir. 2017) ................................................................7

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ....................................................................7

*Rheox, Inc. v. Entact, Inc.*,
No. 98-cv-03731 (MLC), 2000 WL 34540133 (D.N.J. Aug. 21,
2000), *aff'd*, 276 F.3d 1319 (Fed. Cir. 2002)..................................................37

*Selvidge v. United States*,
160 F.R.D. 153 (D. Kan. 1995) ....................................................................19

*Shire LLC v. Amneal Pharms., LLC*,
No. 11-cv-3781, 2013 WL 4045622 (D.N.J. Aug. 8, 2013)..................7, 8, 9, 37

*SimpleAir, Inc. v. Sony Ericsson Mobile Communs. AB*,
820 F.3d 419 (Fed. Cir. 2016) ....................................................................39

*Sinorgchem Co., Shandong v. Int'l Trade Comm'n*,
511 F.3d 1132 (Fed. Cir. 2007) ....................7

*Synthon IP, Inc. v. Pfizer Inc.*,
446 F. Supp. 2d 497 (E.D. Va. 2006) ....................33

*Thermolife Int'l, LLC v. Hi-Tech Pharms., Inc.*,
No. 1:15-cv-00892-ELR, 2019 WL 2354983 (N.D. Ga. Mar. 18, 2019), *report and recommendation adopted*, No. 1:15-cv-00892-ELR, 2019 WL 3526369, *2 (N.D. Ga. June 4, 2019) ....................32, 33

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) ....................22, 37

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
442 F.3d 1322, 1324-29 (Fed. Cir. 2006) ....................9

For the reasons stated below and in Defendant's Opening Claim Construction Brief, the Court should reject Takeda's proposed constructions and adopt Norwich's proposed constructions.

## I. THE PERSON OF ORDINARY SKILL IN THE ART

| Takeda's Definition of a POSA | Norwich's Definition of a POSA |
| --- | --- |
| A person with an academic degree of Doctor of Philosophy (or equivalent degree) in a field related to pharmaceutical sciences with approximately 1 year of relevant experience or a person with commensurate experience. | A person who at the relevant time held a Ph.D., or equivalent degree, in a field related to pharmaceutical sciences, and at least two years of experience in drug discovery and formulation, including in the development of potential drug candidates. The POSA may also have at least two years of experience in pharmaceutical formulation, analytical chemistry, pharmacology, pharmaceutics, crystallography, and/or the treatment of ADHD or consult with others having a Ph.D., Pharm.D., and/or M.D. degree and the requisite experience. |

Norwich's definition of a person of ordinary skill in the art ("POSA") is consistent with the legal standard and with the opinions of each party's experts. Further, Norwich's definition properly accounts for consultation with a Ph.D., Pharm.D., or M.D. having at least two years of experience in pharmaceutical formulation, pharmacology, pharmaceutics, crystallography, and/or the treatment of ADHD. Neither Takeda nor its experts disagree with this. (*See, e.g.*, Takeda's Opening Claim Construction Brief ("Takeda Br.") at 4; Deposition Transcript of

David Taft ("Taft Tr.") at 26:21-24 ("I think it's fair that a person of ordinary skill could – could confer with someone else, perhaps a doctor or maybe some – someone else.") (Ex. 3).) In fact, Dr. Taft's definition of a POSA captures at least some level of experience in "pharmaceutical formulation, analytical chemistry . . . pharmaceutics, even crystallography." (Ex. 3, Taft Tr. at 26:3-7.)

Nevertheless, both parties and their experts agree that the disputed terms should be construed the same way under either party's definition. (*See* Takeda Br. at 4; Defendant's Opening Claim Construction Brief ("Norwich Br.") at 5.) Thus, the Court need not define a POSA at this stage of the case.

## II. CLAIM CONSTRUCTION OF THE PATENTS-IN-SUIT

### A. The "Amphetamine" Terms (Terms 9, 9(a)-(i))

| Joint Entry No. | Patent Claims | Disputed Claim Term | Plaintiffs' Proposal | Defendant's Proposal |
|---|---|---|---|---|
| 9 | '486 patent, claim 11<br>'735 patent, claims 1, 2, 9-11, 13, 14, 16-18<br>'788 patent, claims 1, 20, 25, 30, 39, 44<br>'030 patent, claims 1, 8, 15, 22, 29, 36<br>'031 patent, claims 1, 17 | "amphetamine" | *See infra*, Joint Term Nos. 9(a)-9(g). | "any sympathomimetic phenethylamine derivative that has central nervous system stimulant activity" |

| | | | | |
|---|---|---|---|---|
| | ’774 patent, claims 1, 8, 15, 22, 29, 36<br>’771 patent, claims 1, 8, 15<br>’467 patent, claims 1, 8, 15, 22, 29, 36<br>’561 patent, claims 5-9<br>’936 patent, claims 1, 17, 33, 49<br>’619 patent, claims 1, 8, 15, 22, 29, 36<br>’305 patent, claims 1, 8, 15, 22, 29, 36 | | | |
| 9(a) | ’486 patent, claim 11<br>’735 patent, claim 10 | “compared to amphetamine alone” | “compared to the amphetamine released from L-lysine-d-amphetamine, namely d-amphetamine” | No further construction required other than “amphetamine” above. |
| 9(b) | ’735 patent, claims 2, 11, 13, 14, 17 | “compared to unbound amphetamine” / “unbound amphetamine” | “compared to the amphetamine portion of l-lysine-d-amphetamine when it is unbound, namely, d-amphetamine” | No further construction required other than “amphetamine” above. |

| | | | | |
|---|---|---|---|---|
| 9(c) | ’735 patent, claims 1, 18 | “amphetamine as an active” | “the active amphetamine released from l-lysine-d-amphetamine, namely d-amphetamine” | No further construction required other than “amphetamine” above. |
| 9(d) | ’735 patent, claims 16, 17 | “unbound amphetamine” | “the amphetamine portion of l-lysine-d-amphetamine when it is unbound, namely d-amphetamine” | No further construction required other than “amphetamine” above. |
| 9(e) | ’788 patent, claims 1, 30 | “amphetamines” / “said amphetamine” | “the genus of amphetamines” | No further construction required other than “amphetamine” above. |
| 9(f) | ’788 patent, claims 20, 25, 29, 44<br>’031 patent, claims 1, 17<br>’936 patent, claims 1, 17, 33, 49 | “an amphetamine” | “an amphetamine from the genus of amphetamines” | No further construction required other than “amphetamine” above. |
| 9(g) | ’561 patent, claims 5-9 | “released amphetamine” / “amphetamine released from the prodrug” | “the amphetamine released from L-lysine-d-amphetamine, namely d-amphetamine” | No further construction required other than “amphetamine” above. |

| | | | | |
|---|---|---|---|---|
| 9(h) | '735 patent, claim 9 | "The composition of claim 1 … to treat a patient in need of amphetamine" | "The composition of claim 1 … to treat a patient in need of amphetamine released from the composition of claim 1" | No further construction required other than "amphetamine" above. |
| 9(i) | '030 patent, claims 1, 8, 15, 22, 29, 36<br>'774 patent, claims 1, 8, 15, 22, 29, 36<br>'771 patent, claims 1, 8, 15<br>'467 patent, claims 1, 8, 15, 22, 29, 36<br>'619 patent, claims 1, 8, 15, 22, 29, 36<br>'305 patent, claims 1, 8, 15, 22, 29, 36 | "and having an amphetamine base amount" | "and having an amount of amphetamine component of L-lysine-d-amphetamine or a salt thereof, namely, d-amphetamine" | No further construction required other than "amphetamine" above. |

Takeda's argument is based on a fallacy – the Patents-in-Suit only provide one definition of "amphetamine," not two. (*See* Takeda Br. at 16-17.) The definition reads:

> "Amphetamine" shall mean any of the sympathomimetic phenethylamine derivatives which have central nervous system stimulant activity, ***such as but not limited to***, ***amphetamine***, methamphetamine, . . . .

(ECF No. 80, Takeda Ex. 1, '486 Patent, col. 10, ll. 13-30.) The express definition of "amphetamine" is followed by exemplary compounds that fall within the genus, as indicated by the transitional phrase "such as." Nowhere does the specification state that the second use of the word "amphetamine" is intended to be a separate definition, depending on context.

Indeed, Takeda's reference to this phrase does not even support Takeda's argument that the specification separately defines "amphetamine" to mean "d-amphetamine." (Takeda Br. at 16-17.) Just a few lines down from the "amphetamine" definition, the specification states that "references to amphetamine ***should be interpreted as inclusive of dextro- and levo-isomers***" (Takeda Ex. 1 at col. 10, ll. 49-51 (emphasis added)) – meaning that the reference to "amphetamine" includes both d-amphetamine ***and*** l-amphetamine. In fact, the patents reference l-amphetamine that was part of a product that contained mixtures of d- and l-amphetamine. (*See, e.g.*, Takeda Ex. 1 at Fig. 54A-B (showing plasma d-amphetamine levels following oral administration of Adderall XR® (d- + l-amphetamine)); col. 55, ll. 17-23; col 56, ll. 10-15 (describing Adderall XR® as containing both d- and l-amphetamine).) Thus, the second reference to "amphetamine" in the definition quoted above cannot be understood to refer specifically to d-amphetamine.

In the prior litigation, the Court followed "the express definition of 'amphetamine' in the patent specifications" and adopted a construction that "fit[] the express definition." *Shire LLC v. Amneal Pharms., LLC*, No. 11-cv-3781, 2013 WL 4045622, at *9 (D.N.J. Aug. 8, 2013). Whether under the "broadest reasonable interpretation" or under the litigation-related *Phillips* standards, the applicable law is the same: "the inventor's lexicography governs." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005); *Nestle USA, Inc. v. Steuben Foods, Inc.*, 686 F. App'x 917, 919 n.1 (Fed. Cir. 2017) (applying the broadest reasonable construction standard, stating "[a] patentee cannot partially serve as a lexicographer for a claim term: either the specification includes a binding definition of that term by way of lexicography, or it is to be read consistent with the plain and ordinary meaning"); *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1380 (Fed. Cir. 2009) ("When a patentee explicitly defines a claim term in the patent specification, the patentee's definition controls."). There is no exception to this rule. *See Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1136 (Fed. Cir. 2007) (noting that "the patentee *must be bound* by the express definition" in the specification) (emphasis added). Indeed, Takeda does not identify any difference in the lexicography law under the "broadest reasonable construction" and *Phillips* standards. (Takeda Br. at 17-18.)

Under the applicable law, Takeda's proposed constructions should be rejected because Takeda affirmatively recognizes that the specification defines "amphetamine." (Takeda Br. at 16-17.) And, because every patent at issue incorporates by reference the identical special definition of "amphetamine," the term should be construed across those patents to have the identical definition found in the specification. (*See* ECF No. 80-1, Takeda Ex. 2, '735 Patent, col. 1, ll. 5-10; ECF No. 80-6, Takeda Ex. 7, '788 Patent, col. 1, ll. 5-26; ECF No. 80-7, Takeda Ex. 8, '030 Patent, col. 1, ll. 5-26; ECF No. 80-8, Takeda Ex. 9, '031 Patent, col. 1, ll. 5-26; ECF No. 80-9, Takeda Ex. 10, '774 Patent, col. 1, ll. 5-26; ECF No. 80-11, Takeda Ex. 12, '771 Patent, col. 1, ll. 5-26; ECF No. 80-13, Takeda Ex. 14, '467 Patent, col. 1, ll. 5-26; ECF No. 80-14, Takeda Ex. 15, '561 Patent, col. 1, ll. 5-26; ECF No. 80-15, Takeda Ex. 16, '936 Patent col. 1, ll. 5-26; ECF No. 80-16, Takeda Ex. 17, '619 Patent, col. 1, ll. 5-26; ECF No. 80-17, Takeda Ex. 18, '305 Patent, col. 1, ll. 5-26.) *See Shire*, 2013 WL 4045622, at *8.

Case law supports that the lexicography found in the specification controls in this case. *See, e.g.*, *Braintree Labs., Inc. v. Novel Labs., Inc.*, 749 F.3d 1349, 1355-56 (Fed. Cir. 2014) (reversing the district court's construction, which departed from the explicit definition in the specification, and construing "clinically significant electrolyte shifts" as defined in the specification even though such a construction excluded a preferred embodiment); *Boss Control, Inc. v. Bombardier*

*Inc.*, 410 F.3d 1372, 1378 (Fed. Cir. 2005) (finding that contrary usage in the intrinsic record "d[id] not operate to erase the clear definition of [the claim term] 'interrupt' found in the specification"). Takeda's case, *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, is inapposite because, unlike this case, the court found the specification and claims did not contain an explicit or implicit definition of the disputed term. *See* 442 F.3d 1322, 1324-29 (Fed. Cir. 2006) (noting that "[n]othing in the specification, including the claims, indicates explicitly or implicitly, that the inventor intended to impart a novel meaning to [the disputed term]").

Takeda's alleged "new terms and corresponding constructions" (Takeda Br. at 17) merely rehash the same arguments this Court has already rejected. *See Shire*, 2013 WL 4045622, at *8-9. Indeed, Takeda's "claim context" argument and cited evidence in this case are essentially identical to the arguments and evidence already rejected by the Court in the Prior Litigation:

| **Takeda Opening Claim Construction Br. ("Takeda Br.")** | **Shire Opening Claim Construction Br., ECF No. 332 ("Shire Br.") (Ex. 5)** |
|---|---|
| "The parties dispute whether the term 'amphetamine' carries a different construction in different construction in different claim contexts." (Takeda Br. at 16.) | "The parties' fundamental dispute is whether the term 'amphetamine' has a different meaning in different claim contexts." (Shire Br. at 13.) |
| "While Takeda's construction acknowledges that a broad construction of the term 'amphetamine' is | "In contrast to the Defendants' definition, Shire's construction accounts for ***different claim contexts*** |

| Takeda Opening Claim Construction Br. ("Takeda Br.") | Shire Opening Claim Construction Br., ECF No. 332 ("Shire Br.") (Ex. 5) |
|---|---|
| appropriate ***in certain contexts*** (*i.e.*, Terms 9(e)-(f)), for many claims, such a broad construction cannot be correct. In certain instances, the term ***"amphetamine" refers specifically to "d-amphetamine," such as that released from "L-lysine-d-amphetamine"*** (*i.e.*, Terms 9(a)-(d), (g)-(i))." (Takeda Br. at 16 (emphasis added).) | and recognizes that the word ***'amphetamine' may refer to the d-amphetamine released from the prodrug L-lysine-d-amphetamine."*** (Shire Br. at 13 (emphasis added).) |
| "For example, the specifications use the term 'amphetamine' in different ways within the same sentence:<br><br>"**Amphetamine**" shall mean any of the sympathomimetic phenethylamine derivatives which have central nervous stimulant activity, such as but not limited to, **amphetamine**, methamphetamine, . . . and 3,4-methylenedioxymethamphetamine.<br><br>In the above passage, the first use of 'amphetamine,' in context, refers to a class of drugs, whereas the second use refers to specific amphetamine molecules. Elsewhere, the patents-in-suit refer to specific amphetamine molecules by labeling the chemical structure as 'Amphetamine.'" (Takeda Br. at 16-17 (citing '486 patent, col. 10, | "For example, the specifications use the term 'amphetamine' in different ways within the same sentence:<br><br>"Amphetamine" shall mean any of the sympathomimetic phenethylamine derivatives which have central nervous stimulant activity, such as but not limited to, amphetamine, methamphetamine, . . . and 3,4-methylenedioxymethamphetamine.<br><br>In the above passage, the first use of 'amphetamine,' in context, refers to a class of drugs, whereas the second use refers to specific amphetamine molecules. Elsewhere, the patents-in-suit refer to specific amphetamine molecules by labeling the chemical structure as 'Amphetamine.'" (Shire Br. at 13 (citing '486 patent, col. 10 |

| **Takeda Opening Claim Construction Br. (“Takeda Br.”)** | **Shire Opening Claim Construction Br., ECF No. 332 (“Shire Br.”) (Ex. 5)** |
|---|---|
| ll. 13–19 (emphasis added); ’735 patent, col. 10, ll. 1–11; Taft ¶¶ 63-65).) | ll.13–19 (emphasis added); ’735 patent, col. 10, ll. 1–11; Sawchuk ¶¶ 60–61).) |
| “[T]he patents-in-suit use ‘amphetamine’ as an abbreviation for a specific isomer, such as d-amphetamine. Likewise, the specifications explain that ‘Lysine-Amphetamine’ is an abbreviation for L-lysine-d-amphetamine.” (Takeda Br. at 17 (citing ’031 patent, Example 12, col. 30, l. 57 – col. 31, l. 19; ’735 patent, col. 10, ll. 12-17.).) | “[T]he patents-in-suit use ‘amphetamine’ as an abbreviation for a specific isomer, such as d-amphetamine. Likewise, the specifications explain that ‘Lysine-Amphetamine’ is an abbreviation for L-lysine-d-amphetamine.” (Shire Br. at 13-15 (citing ’031 patent, col. 7, l. 24-26; ’735 patent, col. 10, ll. 12-17.).) |

Takeda does not and cannot point to anything different between the prior-adjudicated construction of “amphetamine,” and the “amphetamine” terms it now seeks to construe. That is because there is nothing unique or different about the context of claim terms 9(a) – 9(d) and 9(g) – 9(i) to meaningfully differentiate them from the claims the Court construed in the Prior Litigation (i.e., terms 9(e) and 9(f)). The following chart compares an exemplary claim from 9(e) and (f) to an exemplary claim containing one of terms 9(a)-(d) and 9(g)-(i):

| **Terms 9(e) & (f) Exemplary Claim – ‘788 Patent, Claim 20** (Emphasis Added) | **Terms 9(a)-(d), 9(g)-(i) Exemplary Claim – ‘771 Patent, Claim 8** (Emphasis Added) |
|---|---|
| “A method, in a subject in need thereof, of delivery an ***amphetamine***, said method comprising ***administering*** | A composition comprising 25 mg of L-lysine-d-amphetamine or a salt thereof and having an amphetamine base |

| | |
|---|---|
| to said subject ***L-lysine-d-amphetamine***." | amount of 7.37 mg of said amphetamine, said ***L-lysine-d-amphetamine*** or a salt thereof providing at least five properties selected from the group consisting of [certain pharmacokinetic values] of ***amphetamine*** when ***orally administered*** to a subject. |

In both claims, the amphetamine is directly tied to the administration of L-lysine-d-amphetamine. In claim 20 of the '788 patent (Takeda Ex. 7), the amphetamine is delivered to the patient by administering L-lysine-d-amphetamine. Similarly, in claim 8 of the '771 patent (Takeda Ex. 12), the amphetamine is provided to the subject by administering L-lysine-d-amphetamine. Thus, there is no meaningfully different "context" for the claimed "amphetamine" in either of the claims – and certainly nothing to override the clear definition of "amphetamine" provided in the specification. Beyond baldly stating that the "contexts" of the claims are "different," Takeda does nothing to reconcile how these minor differences in wording should result in such a large difference in the scope of the claimed "amphetamine."

### B. "L-lysine-d-amphetamine Mesylate" / "Mesylate Salt of L-lysine-d-amphetamine" / "… Wherein Said Salt is a Mesylate Salt" (Term 1)

| Joint Entry No. | Patent Claims | Disputed Claim Term | Plaintiffs' Proposal | Defendant's Proposal |
|---|---|---|---|---|
| 1 | '486 patent, claim 4<br>'735 patent, claim 3<br>'254 patent, claim 3<br>'787 patent, claim 3<br>'788 patent, claims 5, 22, 27, 34, 41, 46<br>'030 patent, claims 3, 10, 17, 24, 31, 38<br>'031 patent, claims 6, 22<br>'774 patent, claims 3, 10, 17, 24, 31, 38<br>'770 patent, claim 4<br>'771 patent, claims 3, 10, 17<br>'466 patent, claim 10<br>'467 patent, claims 3, 10, 17, 24, 31, 38<br>'936 patent, claims 6, 22, 38, 54 | "L-lysine-d-amphetamine mesylate" / "mesylate salt of L-lysine-d-amphetamine" / "… wherein said salt is a mesylate salt" | "a salt of L-lysine-d-amphetamine containing at least one CH3SO3- anion, which can be obtained from methanesulfonic acid" | "mesylate" / "a mesylate salt" means "a salt with any number of mesylate ions associated with it" |

| | | | | |
|---|---|---|---|---|
| | ’619 patent, claims 3, 10, 17, 24, 31, 38<br>’305 patent, claims 3, 10, 17, 24, 31, 38 | | | |

As an initial matter, Takeda’s proposed construction should be rejected because Takeda’s argument does not support its own construction. In its brief, Takeda argues that a “mesylate” salt of L-lysine-d-amphetamine “must have at least one, ***but not more than two***, mesylate (or $CH_3SO_3^-$) anions associated with it.” (Takeda Br. at 7 (emphasis added).) Its expert, Dr. Chyall took the argument even further, stating that a “mesylate” salt can only have ***one or two*** mesylate anions associated with L-lysine-d-amphetamine. (*See* Declaration of Dr. Leonard J. Chyall, Ph.D. in Support of Takeda’s Opening Claim Construction Brief ¶ 44 (“Chyall Decl.”).) On its face, however, Takeda’s construction only requires “at least one” mesylate anion and contains no upper limit. (Takeda Br. at 5.)

Although Takeda cites a number of passages from the specification (*see* Takeda Br. at 6-7), none of the statements supports its argument that a “mesylate salt” can have only one or two associated mesylate ions. For example, citations to the dimesylate salt of L-lysine-d-amphetamine do not address this issue, as both parties’ proposed constructions would cover the dimesylate salt. (*Id.* at 6-7.) Moreover, mere mention of a “mesylate” salt does nothing to elucidate the number of mesylate components that are within the scope of the claimed “mesylate” salts.

Takeda's primary source of extrinsic evidence on this issue, its expert Dr. Chyall, incorrectly applies scientific principles to arrive at an incorrect conclusion regarding the types of mesylate salts that can be formed. For example, Dr. Chyall testified:

> Q. Did you do any investigation in connection with preparing your expert declaration as to whether any hemi-mesylate salts[1] exist with any compound?
>
> A. No need to. They can't exist. Methane sulfonic acid is a monoprotic acid.

(Deposition Transcript of Leonard Chyall at 36:2-8 ("Chyall Tr.") (Ex. 2);[2] *see also id.* at Errata Sheet.) Dr. Chyall made this contention despite having performed no testing and no literature searching to determine what mesylate salts can form with L-lysine-d-amphetamine. (*Id.* at 29:25-30:18.) Had he done an investigation, however, he might have discovered that hemi-mesylate salts are known in the art. For example, United States Patent Publication No. 2018/0134658 describes a hemi-mesylate salt of a pharmaceutical compound, indoximod. (*See* Hollingsworth Resp. Decl. ¶ 11 (citing United States Patent Pub.

---

[1] A hemi-mesylate salt is a salt having one mesylate for every two molecules of its salt pair – in this case L-lysine-d-amphetamine. (Responsive Declaration of Mark Hollingsworth, Ph.D. in Support of Defendant's Responsive Claim Construction Brief ¶ 10 ("Hollingsworth Resp. Decl.") (Ex. 1).)

[2] Dr. Chyall's opinion regarding hemi-mesylate salts is not disclosed in his declaration. It was only during his deposition that Dr. Chyall asserted this opinion.

No. 2018/0134658 at 4 ([0040]), 6 ([0089] & [0099]), 54 ([0278]), and 55 (Table 2)).)

The art's disclosure of a hemi-mesylate salt is consistent with the examples Dr. Hollingsworth, Norwich's expert, illustrated in his opening declaration, which included a number of different ratios of mesylate and L-lysine-d-amphetamine, including a hemi-mesylate, as illustrated below.

**Hemi-Mesylate Example**

**Potential 0.5:1 Ratio (1:2)**



**Potential 1.5:1 Ratio (3:2)**



**Potential 0.25:1 Ratio (1:4)**



**Potential 0.33:1 Ratio (1:3)**



(Corrected Decl. of Mark Hollingsworth, Ph.D., in Support of Def.'s Opening Claim Construction Br. ("Corrected Hollingsworth Decl.") ¶ 52 (hemi-mesylate annotation added); Hollingsworth Resp. Decl. ¶ 10 (describing the hemi-mesylate example).[3]) This variety of possible mesylate salts illustrates that Takeda and Dr.

---

[3] As the Court is aware, Norwich served the Corrected Hollingsworth Declaration, which corrected certain figures in his opening declaration. (ECF Nos. 98 (letter) and 99 (declaration).) The corrected figures are also reproduced here. Norwich

Chyall are incorrect that a POSA would understand that "mesylate" only encompassed the mono- and di-mesylate salts of L-lysine-d-amphetamine. (Hollingsworth Resp. Decl. ¶ 9.) Furthermore, these illustrations also show that Norwich's proposed construction of "mesylate," appropriately, is directly tied to its possible interactions and arrangements with L-lysine-d-amphetamine.

Takeda's criticisms of Norwich's construction lack any merit. A POSA would understand that "any number" encompasses all scientifically possible values. "Zero" is clearly not contemplated, as Norwich's proposed construction uses the word "salt," which requires both mesylate and L-lysine-d-amphetamine components.[4] (Takeda Br. at 8.) Moreover, with respect to Takeda's argument that Norwich's range is unbounded, the specification does not teach an upper limit for this boundary. In any event, Takeda's proposed construction[5] does not specify

---

respectfully directs the Court to refer to the figures reproduced here or in the Corrected Hollingsworth Declaration, rather than the figures in Norwich's opening brief or Dr. Hollingsworth's uncorrected opening declaration.

[4] Should the Court believe that further clarification is necessary, Norwich would be agreeable to the Court adopting the construction "a salt with any ***non-zero*** number of mesylate ions associated with it."

[5] As explained above, it is unclear what Takeda is proposing as the construction of this term because of differences between the proposed construction, Takeda's arguments in its brief, and its experts' testimony. Even under Takeda's argument that there can be one or more but less than two mesylate ions, however, there are an infinite number of fractions between one and two.

an upper limit for "at least one" mesylate anions and is therefore also unbounded. (*Id.*)

Finally, Takeda's reference to the structure of Norwich's ANDA product does not advance its argument. (Takeda Br. at 7.) Takeda fails to explain how an extrinsic, non-public document prepared years after the priority dates of the asserted claims informs the meaning of the Asserted Patents.[6] In any event, the cited document merely illustrates one type of mesylate salt (a dimesylate). Both parties agree that "a mesylate salt" encompasses more than just the dimesylate form.

### C. "Limited Bioavailability of Amphetamine when Administered through Alternative Routes of Administration" (Term 4)

| Joint Entry No. | Patent Claims | Disputed Claim Term | Plaintiffs' Proposal | Defendant's Proposal |
|---|---|---|---|---|
| 4 | '735 patent, claims 1, 18 | "limited bioavailability of amphetamine when administered through alternative | "lower extent of absorption of the amphetamine released following administration of L-lysine-d-amphetamine or a salt thereof | No further construction required; plain and ordinary meaning.<br><br>The parties have agreed on the terms "bioavailability," |

[6] That Dr. Chyall references Norwich's ANDA despite its irrelevance to claim construction is evidence that Dr. Chyall is acting as Takeda's advocate, rather than an independent expert. *Selvidge v. United States*, 160 F.R.D. 153, 156 (D. Kan. 1995) ("An expert witness should never become one party's expert advocate.").

| | | | | |
|---|---|---|---|---|
| | | routes of administration" | through parenteral routes of administration often employed in illicit use compared to the extent of absorption of d-amphetamine following administration of a comparable molar dose of d-amphetamine or a salt thereof through parenteral routes of administration often employed in illicit use" | "alternative routes of administration," and "administered" and are separately briefing the term "amphetamine." |

The Court should reject Takeda's second and equally unsupported attempt to read "d-amphetamine" into the claims by introducing a comparison into the claim term. Takeda's argument (Takeda Br. at 9-12) ignores highly relevant intrinsic evidence where L-lysine-d-amphetamine's bioavailability is not compared to that of d-amphetamine. For example, the specification states that "the conjugate [L-lysine-d-amphetamine] did not release any significant amount of d-amphetamine," (Takeda Ex. 2 at col. 28, ll. 32-34), and that, in a preferred embodiment, absorption is "prevented . . . and/or delayed when delivered by routes other than oral administration," (*id.* at col. 11, ll. 1-4). Neither statement requires a comparison to

the bioavailability of a comparable molar dose of d-amphetamine – one can measure failure to "release any significant amount" and failure to "absorb[]" independently of a comparator. In fact, these passages suggest a broader meaning of "limited" that also encompasses delayed bioavailability in addition to "lower" bioavailability.

The prosecution history also contradicts Takeda's argument that a comparator is necessary, and instead supports Norwich's construction. Takeda's expert, Dr. Taft, quotes the following statement from the prosecution history: "L-lysine-d-amphetamine . . . exhibited a high % AUC of amphetamine but only about 50% of its $C_{max}$ when administered orally, *and **minimal activity** when administered by the intranasal or intravenous routes*." (Declaration of Dr. David R. Taft, Ph.D. in Support of Takeda's Opening Claim Construction Brief ¶ 49 (citing Takeda Ex. 20, TAKVYV01704433, '735 File History, Applicants' October 10, 2006 Remarks at 12) (emphasis added).) Contrary to Takeda's argument, the emphasized language, "minimal activity," includes no comparison to d-amphetamine or any other amphetamine. Further, the applicants stated earlier in their Remarks that "the claimed prodrug was specifically selected because it provides for release of the active upon oral administration, *but does not provide for release of the active following alternative routes of administration*, i.e., it provides abuse resistance." (*Id.* at 7 (emphasis added).) If a prodrug "does not provide for

release of the active following alternative routes of administration," then it does not need to be compared to d-amphetamine – or anything else – to determine that the active is not released. By restricting "limited" to "lower" bioavailability compared to d-amphetamine, Takeda's construction would improperly read out these embodiments that state why L-lysine-d-amphetamine was "specifically selected." *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583-84 (Fed. Cir. 1996) (rejecting an attempt to construe a term in such a way that it would read out a preferred embodiment of the invention).

Furthermore, Takeda's proposed construction would exclude an example in the specification of the Asserted Patents in which the comparator was not d-amphetamine. In Example 33, the comparator was Adderall XR® which is "a mixture of d-amphetamine ***and l-amphetamine*** salts." (Takeda Ex. 2 at col. 56, l. 4 (emphasis added); *see also* Figs. 54A-B) If the claims are limited to d-amphetamine as Takeda proposes, they would no longer cover this example even though the claim's plain language is broad enough to encompass it. Takeda offers no justification for reading out this embodiment.

Construing "limited" as "lower" would substantially change the meaning of the claims. Whereas "limited" suggests "prevent[ion]" of absorption and failure to "release any significant amount" of drug (*see supra* pp. 20-21), Takeda's "lower" construction adds uncertainty as to how much "lower" the bioavailability needs to

be to fall within or outside the claims. Indeed, Takeda's expert, Dr. Taft, did not have an opinion about this. (Taft Tr. at 56:13-21; 57:23-58:1.) Takeda's construction is also ambiguous about whether the "lower" bioavailability must be numerically or statistically significantly lower, and Dr. Taft had no opinion on this either. (*See id.* at 56:22-57:10.) Thus, Takeda's construction would allow Takeda to argue that even infinitesimally small differences in bioavailability fall within the claim, notwithstanding that such small differences are not "limited" bioavailability.

Moreover, Takeda provides no argument as to why this term should be construed to require comparison to an ***equivalent molar dose*** of d-amphetamine. Nothing in the intrinsic evidence cited by Takeda even mentions "molar dose[s]" of d-amphetamine. As mentioned above, "limited" does not require a comparator, and thus no mention of "equivalent molar dose[s]" in the construction of this term is necessary. Further, in several references in the specification, the comparator was Adderall XR® which is a mixture of d-amphetamine and l-amphetamine. (*See supra* p. 6.)

### D. "$C_{max}$ which Results in Euphoria" (Term 6)

| Joint Entry No. | Patent Claims | Disputed Claim Term | Plaintiffs' Proposal | Defendant's Proposal |
|---|---|---|---|---|
| 6 | '486 patent, claim 11<br>'735 patent, claim 10 | "$C_{max}$ which results in euphoria" | Plain and ordinary meaning, i.e., "a $C_{max}$ of the amphetamine | No further construction required; plain |

| | | | | |
|---|---|---|---|---|
| | | | released from L-lysine-d-amphetamine that results in euphoria (e.g., a feeling of well-being)." | and ordinary meaning. |

Norwich's construction follows the Court's "ordinary meaning" construction from the Prior Litigation and should once again be adopted here. The parties' dispute rests on the proper constructions of the terms (1) "euphoria," specifically, the appropriate *degree* of the feeling of well-being contemplated by the patents, and (2) "$C_{max}$," which Takeda would restrict to mean "a $C_{max}$ of the amphetamine released from L-lysine-d-amphetamine."

Regarding "euphoria," Takeda's proposed construction is overly broad because it fails to differentiate between ordinary, benign feelings of well-being and undesirable euphoric feelings of well-being. As Takeda acknowledges (Takeda Br. at 13), the intrinsic evidence unambiguously states that euphoria is an "undesirable" effect. (ECF No. 82-8, Ex. 24, TAKVYV01708704 at 1714902, '787 File History, Applicants May 12, 2009 Remarks at 3 (stating that high peak concentrations of d-amphetamine can lead to an "undesirable euphoric effect.").) Nothing in the intrinsic evidence (1) equates a mere feeling of well-being with euphoria or any other undesirable condition, or (2) otherwise supports such an overbroad construction. Even Takeda's expert, Dr. Taft, recognized that not every

feeling of well-being is euphoric. (Taft. Tr. at 69:16-23, 75:24-77:9.) Indeed, pharmacists (Dr. Taft is a professor of pharmacy) treat patients so that they obtain a feeling of well-being (68:4-12) – but this feeling of well-being is different from the clinically undesirable euphoria that leads to drug addiction and that the Asserted Patents seek to avoid.

Instead, Takeda's proposed construction rests entirely on dictionary definitions, but there is a disconnect between that evidence and Takeda's proposed construction. According to those dictionary definitions, euphoria connotes an exaggerated, extreme, and "not . . . well-founded" state of well-being as compared to, for example, ordinary feelings of contentment. (*See* ECF No. 85-9, Takeda Ex. 38, TAKVYV01743255 at 257, Stedman's Medical Dictionary (26th ed. 1995) ("a feeling of well-being, commonly **exaggerated and not necessarily well founded**"); ECF No. 85-10, Takeda Ex. 39, TAKVYV01745277 at 280, The Dictionary of Medicine (3d ed. 2000) ("feeling of **extreme** happiness"); ECF No. 85-15, Takeda Ex. 44, TAKVYV01745282 at 285, Dictionary of Pharmacy (University of South Carolina Press 1986) ("an **extreme** state of perceived well-being"); ECF No. 85-11, Takeda Ex. 40, TAKVY01745286 at 289, Merriam Webster's Medical Desk Dictionary (1996) ("a feeling of well-being or elation; *esp*: one that is **groundless, disproportionate to its cause, or inappropriate to one's life situation**"); ECF No. 85-12, Takeda Ex. 41, TAKVYV01745290 at 293,

Merriam Webster's Medical Dictionary (1995) ("a feeling of well-being or elation; *esp*: one that is **groundless, disproportionate to its cause, or inappropriate to one's life situation**") (emphases added).) It is these undesirable euphoric effects that lead to abuse of these drugs. (ECF No. 80, Takeda Ex. 1, '486 patent at col. 1, ll. 54-58.). Takeda simply omits these parts of the dictionary definition, thereby improperly broadening the types of feelings of well-being that are "euphoric" to encompass even normal, everyday, non-euphoric feelings of well-being. In light of the foregoing, the Court should adopt its prior "plain and ordinary meaning" construction and, if necessary, clarify that euphoria is a feeling of well-being that is exaggerated, extreme, and not well-founded.

On the construction of "$C_{max}$," there is no basis to incorporate "amphetamine" – or, as Takeda proposes, "a $C_{max}$ of the amphetamine released from L-lysine-d-amphetamine" – into the claim construction here. (*See* Norwich Br. at 23.) Takeda's brief offers no explanation for its construction of "$C_{max}$," and the Court should reject Takeda's construction on that basis alone. (Takeda Br. at 13-14.) The claim language is clear that "L-lysine-d-amphetamine or a pharmaceutically acceptable salt thereof" – not "amphetamine" – must be "in an amount insufficient to provide a $C_{max}$ which results in euphoria." (*See* Takeda Ex. 2 at claim 10.) Further construction of "$C_{max}$" is unnecessary.

### E. "Isolated" (Term 14)

| Joint Entry No. | Patent Claims | Disputed Claim Term | Plaintiffs' Proposal | Defendant's Proposal |
|---|---|---|---|---|
| 14 | '787 patent, claims 1, 2 | "isolated" | "a substance separated from a crude mixture of reactants and/or solvents" | "non-salt form" |

Despite Takeda's general contention that its "constructions are supported by . . . the context of the claims," (Takeda Br. at 2), Takeda ignores the claim language surrounding the "isolated" term, and instead relies on statements and words that do not address the claim context in which "isolated" is found. (*Id.* at 24-27.)

The context of the claims is dispositive in this case, as it emphasizes the difference between "isolated" L-lysine-d-amphetamine, and salts of L-lysine-d-amphetamine – a dichotomy that was expressly stated by the applicants during prosecution. Specifically, on the previous page to the one that Takeda cites, the applicants stated:

> Applicants respectfully submit that the claims are directed to (i) isolated L-lys[ine]-d-amphetamine and (ii) a pharmaceutically acceptable salt of L-lys[ine]-d-amphetamine. *See*, for instance, claim 36 which recites a "compound selected from the group consisting of [(i)] isolated L-lysine-d-amphetamine and [(ii)] a

pharmaceutically acceptable salt of L-lysine-d-amphetamine."

(ECF No. 82-13, Takeda Ex. 24, '787 File History, TAKVYV01708704 at 1715693 (brackets in original).) In this passage, the applicants clearly indicated the dichotomy present in claim 1 of the '787 patent by inserting Roman numerals "(i)" and "(ii)" when describing what the claims are "directed to" and when quoting the claim language. Both clauses (i) and (ii) include reference to "L-lysine-d-amphetamine," but differ in that one is "isolated," and the other is "a pharmaceutically acceptable salt." Thus, the intrinsic record demonstrates that "isolated" is being used to differentiate non-salt forms from salt forms of L-lysine d-amphetamine.

Instead of following this straightforward reading of the claims, Takeda proposes a construction that leads to absurd results. Dr. Chyall acknowledged that the word "isolated" only modifies "L-lysine-d-amphetamine" and not "pharmaceutically acceptable salt." (Chyall Tr. at 62:2-21.) This means that Dr. Chyall interprets claim 1 of the '787 patent such that it covers (i) "isolated" L-lysine-d-amphetamine in its non-salt or "freebase" form[7] and (ii) non-isolated

[7] Dr. Chyall erroneously testified that "isolated L-lysine-d-amphetamine" covers "isolated L-lysine-d-amphetamine salts," based on his mistaken understanding that the term "L-lysine-d-amphetamine" includes its pharmaceutically acceptable salts. The parties have agreed that L-lysine-d-amphetamine only refers to the molecule and does not include its salts.

pharmaceutically acceptable salts of L-lysine-d-amphetamine. (*Id.* at 62:11-21.) Under Takeda's proposed construction, the non-salt form of L-lysine-d-amphetamine would have to be "separated from a crude mixture of reactants and/or solvents," but its salt form nonsensically would not have to be, even though references that Takeda points to in its brief indicate that salts can be "isolated" from reactants and/or solvents. (Takeda Br. at 26-27 (quoting an article that describes "isolat[ing]" a "hemisulfate salt").) Indeed, in the pharmaceutical context, a POSA would equally want a drug and any salt of the drug to be free of reactants and/or solvent impurities for safety reasons. (Hollingsworth Resp. Decl. ¶ 21.) As such, the more logical reading is that "isolated" has nothing to do with separation from other reactants and solvents. Instead, "isolated" distinguishes L-lysine-d-amphetamine from its separately identified "salt" forms.

Furthermore, Takeda bases its argument on mere speculation that the Examiner initially suggested the addition of the word "isolated" to the claims, and further speculation about the Examiner's motivation for allegedly proposing the amendment.[8] (Takeda Br. at 26.) The prosecution history indicates that an

[8] In the Joint Claim Construction Statement, Takeda did not identify the specific events and articles in the '787 patent file history that it now cites in its brief. (Takeda Br. at 25-26.) Instead, Takeda identified the "'787 patent and file history generally," but did not identify a single document or page within that file history. (ECF No. 77, Joint Claim Construction Statement at 68-70.) This file history, which Takeda attached as Exhibit 24 to its opening brief, contains over 7,000

amendment was suggested during an Examiner interview, but the prosecution history does not indicate whether it was the Examiner or the applicant who suggested this amendment. (ECF No. 82-11, Takeda Ex. 24, '787 File History, TAKVYV01708704 at 1715316.) Takeda could have provided evidence from a person having personal knowledge of these events (e.g., by declaration from the patent prosecution counsel), but it failed to do so. Indeed, even Dr. Chyall recognizes this uncertainty. (Chyall Decl. ¶ 58 ("The word 'isolated' *seems* to have been suggested by the Examiner . . . .") (emphasis added).) Moreover, the prosecution history does not expressly state why the term "isolated" was added. Takeda attempts to divine some unstated motivation from the mere fact that the amendment was suggested, rather than properly focusing on how the applicants actually used the term in arguments to the Examiner.

In addition to the claim context, the specification of the '787 patent supports Norwich's construction, not Takeda's. (*See* Takeda Br. at 25.) As Norwich

---

pages (TAKVYV01708704-TAKVYV01715749). (*See* Decl. of Andrew Roper ¶ 24.) Citing "generally" to the entire file history cannot satisfy Takeda's obligations under the Local Patent Rules. For example, citing the entire prosecution history does not identify "all references from the specification or prosecution history that support its preliminary proposed construction." (L. Pat. R. 4.2(b).) Thus, the Court should strike Takeda's citations to the prosecution history on pages 25-26 of its brief because this evidence was not timely disclosed. To the extent the Court decides to consider this evidence, however, the Court should also consider Norwich's response to such evidence.

explained in its opening brief, the only disclosure of "isolated" in the '787 patent specification – in Example 2 – is not in the context of salt formation. (Norwich Br. at 26-27; Hollingsworth Resp. Decl. ¶ 24.)

Takeda also states that the claims could have included the word "freebase" from the specification, (Takeda Br. at 27), but Takeda cites no law (and Norwich is unaware of any) that requires that the same words be used in the specification and the claims. Moreover, the specification does not exclusively use "freebase" to connote non-salt forms, but also uses other words such as "free form."[9] (ECF No. 80-5, Takeda Ex. 6, '787 Patent at col. 39, Tables 31 and 32; col. 41, Table 33; col. 42, Table 34.) The passing mention of "freebase" in the specification is not accompanied by any express or implied indication that it is the only way in which the inventors described non-salt forms of drugs, and thus does not contradict Norwich's proposed construction. Furthermore, Takeda's citation to the specification's use of "freebase" refers to the "d-amphetamine freebase," not the non-salt form of L-lysine-d-amphetamine. (Hollingsworth Resp. Decl. ¶ 26.)

Takeda's dictionary definition and cited articles from the '787 patent file history are also irrelevant. The dictionary definition lacks the important context

[9] Even with respect to other terms in this case, there is a mismatch between the words in the specification and the claims, such as for the disputed term "limited bioavailability."

provided by the claims in this case. (Takeda Br. at 26-27.) Similarly, the cited articles do not use "isolated" in the same context as in the claims here and do not relate to L-lysine-d-amphetamine. (Chyall Tr. at 50:15-60:2; Hollingsworth Resp. Decl. ¶ 25.)

Takeda's cited cases are also distinguishable, (Takeda Br. at 27), because they arose under different contexts and involve claims that did not contain the same dichotomy between non-salt and salt forms of a pharmaceutical at issue here. For example, Takeda mistakenly describes *Thermolife* as "construing" claim terms when in fact the court merely denied the defendant's motion to preclude the plaintiff from relying on untimely definitions and expert testimony for purposes of claim construction. *Thermolife Int'l, LLC v. Hi-Tech Pharms., Inc.*, No. 1:15-cv-00892-ELR, 2019 WL 2354983, *1 (N.D. Ga. Mar. 18, 2019), *report and recommendation adopted*, No. 1:15-cv-00892-ELR, 2019 WL 3526369, *2 (N.D. Ga. June 4, 2019). Neither the report and recommendation nor the order adopting it construes a single claim term. *Thermolife*, 2019 WL 2354983, *1-5, 2019 WL 3526369, *1-2. Rather, the language that Takeda quotes refers to the plaintiff's proposed construction, which the defendant contended had changed. *Thermolife*, 2019 WL 2354983, *3. Even considering the proposed construction, however, *Thermolife* is distinguishable because the claims in that case did not contain the dichotomy established in the claims here, and instead appeared focused on

methods of obtaining compounds from natural sources. *See id.* (proposing a construction for "isolated . . . compound" as "a compound that has been isolated, to at least some extent, from its natural source"). Takeda's remaining cases similarly do not involve claims with the dichotomy present in this case. *See Cipla Ltd. v. Sunovion Pharms. Inc.*, No. 15-cv-424-LPS, 2017 WL 2778352, at *6 (D. Del. June 27, 2017) (construing claims requiring a "pure and isolated" tartrate salt); *Synthon IP, Inc. v. Pfizer Inc.*, 446 F. Supp. 2d 497, 512 (E.D. Va. 2006) (construing claims requiring an "isolated" compound regardless of its form); *Mannatech, Inc. v. Glycobiotics Int'l, Inc.*, 513 F. Supp. 2d 754, 757-58 (N.D. Tex. 2007) (construing claims requiring "isolated and purified" compounds in a dietary supplement).

### F. The Milligram Dosage Terms (without "about") (Terms 16, 17, 18, 19)

| Joint Entry No. | Patent Claims | Disputed Claim Term | Plaintiffs' Proposal | Defendant's Proposal |
|---|---|---|---|---|
| 16 | '788 patent, claim 12<br>'030 patent, claims 1, 22<br>'031 patent, claims 13, 29<br>'774 patent, claims 1, 22<br>'771 patent, claim 1 | "25 to 75 mg" | Plain and ordinary meaning. | No construction needed; plain and ordinary meaning, i.e., "precisely 25 mg to precisely 75 mg." |

| | | | | |
|---|---|---|---|---|
| | ’486 patent, claims 1, 22<br>’936 patent, claims 13, 29, 45, 61<br>’619 patent, claims 1, 22<br>’305 patent, claims 1, 22 | | | |
| 17 | ’030 patent, claims 1, 22<br>’774 patent, claims 1, 22<br>’771 patent, claim 1<br>’467 patent, claims 1, 22<br>’619 patent, claims 1, 22<br>’305 patent, claims 1, 22 | “7.37 to 22.1 mg” | Plain and ordinary meaning. | No construction needed; plain and ordinary meaning, i.e., “precisely 7.37 mg to precisely 22.1 mg.” |
| 18 | ’030 patent, claims 8, 15, 29, 36<br>’774 patent, claims 8, 15, 29, 36<br>’771 patent, claim 8, 15<br>’467 patent, claims 8, 15, 29, 36<br>’619 patent, claims 8, 15, 29, 36<br>’305 patent, claims 8, 15, 29, 3 | “25 mg” / “75 mg” | Plain and ordinary meaning. | No construction needed; plain and ordinary meaning, i.e., “precisely [25 mg / 75 mg].” |

| | | | | |
|---|---|---|---|---|
| 19 | ’254 patent, claims 5-7<br>’770 patent, claims 6-8, 25-27<br>’031 patent, claims 14-16, 30- 32<br>’936 patent, claims 14-16, 30- 32, 46-48, 62-64<br>’788 patent, claims 13-15<br>’466 patent, claims 6-8 | “30 mg” / “50 mg” / “70 mg” | Plain and ordinary meaning. | No construction needed; plain and ordinary meaning, i.e., “precisely [30 mg / 50 mg / 70 mg].” |

Although Takeda claims to be proposing the Court’s construction from the Prior Litigation for these terms (other than the terms with “about”) (*see* Takeda Br. at 28), Takeda’s arguments demonstrate that it is departing from that construction by insisting that the milligram dosage terms encompass an undefined level of variability.[10]

[10] Takeda accuses Norwich of contravening Local Patent Rule 4.2(a) by failing to further construe certain terms for which it asserts “plain and ordinary” meaning. (Takeda Br. at 9, 13.) But Takeda engages in the very same conduct here. Furthermore, Norwich’s assertions of “plain and ordinary” meaning for Terms 4 and 6 are consistent with this Court’s prior holdings. This Court has not construed the milligram dosage terms including “about,” and for the reasons set forth below, Takeda’s explanatory assertions with respect to Terms 16-19 align substantially with the construction this Court previously *rejected*. For this reason alone, this Court should reject Takeda’s proposed construction.

Both parties' experts agree that these milligram dosage terms are precise to the nearest whole number – i.e., the last specified significant digit shown in the claims. Takeda's expert, Dr. Chyall, explained that the claim term "25 mg," for example, "doesn't mean any other value – it means 25 and not 24 or 26." (Chyall Tr. at 70:20-71:9; *see also id.* at 72:3-16 ("When the claim term says 25 or if it says 75 and there's no modifier such as the word about, and here my – my testimony is with respect to what I have in the table in 66, paragraph 66, the level of precision is to the nearest whole number. 25 means 25, not 26 or 24.").) Norwich's expert, Dr. Barzman, expressed the same viewpoint, stating that "25 would be precise if it's rounded to 25." (Deposition Transcript of Drew Barzman, M.D. at 112:17-113:5 (Ex. 4).) Thus, both experts agreed that the milligram dosage terms are properly construed to be the specific dosage amount recited in the claim – which squares with Norwich's proposed construction of "precisely" the stated dosage term.

Notwithstanding the agreement between both parties' experts and Norwich's proposed construction, Takeda muddies the waters by raising the argument that the milligram terms should be construed to permit a range that accounts for variability from the manufacturing processes. The Court rejected that argument in the Prior Litigation, and instead "agree[d] with defendants" that the terms should have their ordinary meaning, which defendants considered "[the milligram amount],

significant to the last digit shown," *Shire*, 2013 WL 4045622, at *11; ECF No. 241 at 1-14 – in other words, "precisely" the specified milligram amount. As recognized by the Court in the Prior Litigation, incorporating such a range of variability "would expand the scope of the claim beyond the bounds set by the clear language," 2013 WL 4045622, at *11, and exceed the degree of variability that both parties' experts testified would be appropriate.

Takeda departs from the Court's prior construction in another respect. Only citing to unsupported expert testimony, Takeda argues that regardless of how much drug is present in a composition, the dose is determined by "the amount of drug substance that a manufacturer claims is contained for each unit dose." (Takeda Br. at 28.) There is no mention of a manufacturer in the specification, much less manufacturers' claims regarding drug content in a unit dose – and Takeda points to no intrinsic evidence to support this argument. Furthermore, the Asserted Patents also contemplate research uses (*see, e.g.*, ECF No. 80-7, Takeda Ex. 8, '030 Patent at Examples 7-12 (describing a study using L-lysine-d-amphetamine in rats).), which would not involve manufacturer claims regarding drug content. *See Rheox, Inc. v. Entact, Inc.*, No. 98-cv-03731 (MLC), 2000 WL 34540133, at *10 (D.N.J. Aug. 21, 2000), *aff'd*, 276 F.3d 1319 (Fed. Cir. 2002) (citing *Vitronics*, 90 F.3d at 1583) ("The general rule is that a claim should not be interpreted to exclude the preferred embodiment expressed in the written description."). And, the Court's

prior construction of the same terms said nothing regarding manufacturers' claims. Takeda's argument again demonstrates that Takeda, through its vague allusions to "plain and ordinary meaning" is attempting to substantially change the scope of this term.

Norwich's ANDA documents and discovery responses also do not provide a reason to depart from Norwich's construction. Takeda fails to explain how such documents are relevant to how a POSA would have understood the milligram terms, (Takeda Br. at 29), particularly where such documents were generated well after the priority date and are not part of the intrinsic evidence or available to the public. (*See supra* p. 19.)

### G. "About 30 mg" / "About 50 mg" / "About 70 mg" (Term 20)

| Joint Entry No. | Patent Claims | Disputed Claim Term | Plaintiffs' Proposal | Defendant's Proposal |
|---|---|---|---|---|
| 20 | '561 patent, claims 2-4 | "about 30 mg" / "about 50 mg" / "about 70 mg" | Plain and ordinary meaning. | Plain and ordinary meaning, i.e., "approximately [30 mg / 50 mg / 70 mg]." |

The Court should reject Takeda's "plain and ordinary meaning" of the "about" milligram terms because Takeda fails to provide any substantive argument on this term except to state that "such claims contemplate variability in this value that is greater than the variability associated with the recitation of the milligram

amount alone." (Takeda Br. at 28-29.) By offering no explanation as to what this level of variability is for the "about" terms or further clarity as to what its alleged "plain and ordinary meaning" is, however, the scope of Takeda's construction is unclear. [11]

As further detailed in Norwich's opening brief, having an unduly large level of variability would cause "about 30 mg" to be indistinguishable from the separately claimed and described 25 mg dose, or the "about 70 mg" dose to be indistinguishable from the separately claimed and described 75 mg dose. (Norwich Br. at 29.) Consistent with this, Dr. Chyall testified that the "about" terms should be construed so the different doses in the claims are distinguishable from one another. (Chyall Tr. at 86:10-23.) "About" should be narrowly confined to ensure that all the claim limitations – some of which are separated from others by only 5 mg – are given meaning. *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."); *Impax Labs., Inc. v. Actavis Labs. FL, Inc.*, No. 15-cv-6934 (SRC), 2017 WL 1900726, at *12 (D.N.J. May 9, 2017) ("[I]nterpretations that render some portion of the claim language superfluous are disfavored.") (citing *SimpleAir, Inc. v. Sony Ericsson*

[11] *See supra* n.10.

*Mobile Communs. AB*, 820 F.3d 419, 429 (Fed. Cir. 2016).) Takeda's undefined "plain and ordinary meaning," viewed together with its "variability"-based argument does not accomplish this end. Norwich's proposed construction uses the term "approximately" to signal that there is more variability than the "milligram" terms that do not contain the word "about" while maintaining the distinctions between the stated milligram doses. (Norwich Br. at 28-29.)

## III. CONCLUSION

For the foregoing reasons, Norwich respectfully requests that the Court adopt Norwich's claim constructions.

Dated: September 27, 2021

/s/ Arnold B. Calmann

Arnold B. Calmann
Katherine A. Escanlar
**SAIBER LLC**
One Gateway Center, 10th Floor,
Suite 1000
Newark, New Jersey 07102
Telephone: (973) 622-3333

Matthew J. Becker
Edward M. Mathias
Thomas K. Hedemann
**AXINN, VELTROP &**
**HARKRIDER LLP**
90 State House Square
Hartford, CT 06103
(860) 275-8100

Jason T. Murata
**AXINN, VELTROP &**
**HARKRIDER LLP**
560 Mission Street
San Francisco, CA 94105
(415) 490-2000

*Attorneys for Defendant Norwich Pharmaceuticals, Inc.*