Michael R. Griffinger
Charles H. Chevalier
Sylvia-Rebecca Gutiérrez
**Gibbons P.C.**
One Gateway Center
Newark, New Jersey 07102-5310
Telephone: (973) 596-4500
Facsimile: (973) 596-0545

Edgar H. Haug
Porter F. Fleming
Andrew S. Roper
Kaitlin M. Abrams
**Haug Partners LLP**
745 Fifth Avenue
New York, New York 10151
Telephone: (212) 588-0800
Facsimile: (212) 588-0500

*Attorneys for Plaintiffs*
*Takeda Pharmaceutical Co. Ltd. and Takeda Pharmaceuticals USA Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| TAKEDA PHARMACEUTICAL COMPANY LIMITED, and TAKEDA PHARMACEUTICALS U.S.A., INC. | ) | |
| Plaintiffs, | ) | C.A. No. 20-cv-8966-SRC-CLW |
| v. | ) | [redacted] |
| NORWICH PHARMACEUTICALS, INC. Defendant. | ) | |

**<u>DECLARATION OF DR. LEONARD J. CHYALL, PH.D.</u>**
**<u>IN SUPPORT OF TAKEDA'S OPENING CLAIM CONSTRUCTION BRIEF</u>**

# TABLE OF CONTENTS


I. BACKGROUND AND QUALIFICATIONS .......... 1

A. Education and Experience .......... 1

B. Prior Testimony .......... 4

C. Compensation .......... 5

II. ANTICIPATED TESTIMONY AND MATERIALS CONSIDERED .......... 5

III. SUMMARY OF PROPOSED CLAIM CONSTRUCTIONS .......... 6

IV. BACKGROUND .......... 9

A. Claim Construction Legal Standard .......... 9

B. Person of Ordinary Skill in the Art .......... 10

V. AGREED UPON TERMS .......... 12

VI. PROPOSED CLAIM CONSTRUCTIONS .......... 16

A. Claim Terms Relating to L-lysine-d-amphetamine Mesylate .......... 16

B. "Isolated" .......... 26

C. Claim Terms Related to Milligram Amounts .......... 31

**I, Leonard J. Chyall, Ph.D., declare as follows:**

1. I have personal knowledge of the following matters and, if called to testify, I can and will testify thereto.

# I. BACKGROUND AND QUALIFICATIONS

## A. Education and Experience

2. I am currently an independent consultant with my business Chyall Pharmaceutical Consulting, LLC ("Chyall Pharma"). I am a Ph.D. chemist with expertise in the study of organic materials and, more specifically, the synthesis, characterization, and analytical testing of drug substances and drug products. As outlined below, I am an organic chemist by education and profession, with training and over 30 years of experience in this field.

3. I obtained my Bachelor of Arts degree with a major in chemistry from Oberlin College in 1986 and my Ph.D. in chemistry from the University of Minnesota in 1991. My doctoral research focused on the synthesis and characterization of novel organic molecules, and my dissertation titled, "The synthesis and thermal rearrangements of 7,7-dibromo-trans-bicyclo[4.1.0]hept-3-ene and 7,7-dichloro-trans-bicyclo[4.1.0]hept-3-ene," focused on understanding the reactivity of high-energy cyclopropane molecules. This work involved the multi-step chemical synthesis of the title compounds and a study of their mechanisms of rearrangement into other compounds upon heating.

4. I was a postdoctoral fellow from 1992-1996 in the chemistry department at Purdue University, where I furthered my understanding of the properties and reactivity of organic molecules. These studies involved both small molecular weight molecules as well as large biological molecules.

5. Following my postdoctoral fellowship, I worked as a research chemist at Great Lakes Chemical Corporation (now part of LANXESS). My research involved the identification,

characterization, and development of new products for the company. In particular, I worked on identifying novel materials that could be blended with polymers to decrease their flammability. These so-called “flame retardants” are used in the polymer industry to reduce the flammability of polymers that are used in a variety of end-use applications, such as electronics, automotive parts, and carpeting, among many other applications. Some of my work at Great Lakes Chemical involved the chemical synthesis of organic molecules on the milligram to kilogram scale.

6. In 2000, I left Great Lakes Chemical and became a research investigator at SSCI, Inc. (“SSCI”), and in 2003, I was promoted to senior research investigator. In 2006, SSCI was purchased by Aptuit. SSCI is now part of Curia, Inc. I held various positions at Aptuit and most recently held the title of Director prior to my departure from the Company. In May 2011, I left Aptuit and founded Chyall Pharma, which is my independent consulting business.

7. I have authored or co-authored over 20 publications in peer-reviewed scientific journals. I am a co-inventor on five patents granted by the United States Patent and Trademark Office (“USPTO”). Three of these patents concern polymer additives, which stem from research that I conducted at Great Lakes Chemical. The two most recent patents concern crystalline forms of pharmaceutical drug substances. I have also given numerous scientific presentations at various technical meetings on topics related to organic chemistry and pharmaceutical sciences.

8. Through my education and work experiences, I have obtained extensive education and training in chemistry with specific experience in the areas of organic chemistry and pharmaceutical sciences. I have worked on numerous projects providing research and consulting services related to the development of pharmaceutical drug substances and pharmaceutical products. At SSCI and Aptuit, I managed protocol studies conducted for clients who sought to identify suitable solid forms of their drug candidates. Some of this work involved attempting to

produce different salt forms of a drug candidate and conducting further characterization (e.g., stability studies, crystal form screening experiments, etc.) in order to identify the appropriate solid forms of the drug candidate for further development.

9. I have worked on projects involving the characterization of drug substances that have been formulated into final dosage forms. I have investigated the reactivity of pharmaceutical drug substances and excipients as a function of the processes used to manufacture the corresponding drug products. I have worked on the development of pharmaceutical products for oral, parenteral, topical, and transdermal administration. I understand and am familiar with various technologies used to synthesize drug substances and manufacture drug products. I have conducted reverse engineering studies (i.e., deformulation studies) to identify the composition of commercial drug products and the methods by which they are manufactured.

10. I have extensive experience in the characterization of pharmaceutical solids using numerous techniques, including X-ray powder diffraction analysis (XRPD), differential scanning calorimetry (DSC), thermogravimetric analysis (TGA), solubility measurements, Karl Fischer (KF) analysis, solid state NMR spectroscopy (SS-NMR), and vibrational spectroscopy among numerous other techniques.

11. I am qualified to teach university-level chemistry classes. Most recently I was employed as a lecturer at Purdue University, where in the summer of 2020 I taught introductory organic chemistry to students majoring in the life sciences. My class concerned the properties and reactivity of organic molecules as it relates to synthetic organic chemistry. My class also involved the nomenclature and properties of amino acids, and the acid-base properties of organic molecules.

12. I am qualified to review the research activities of other scientists and laboratories operating within the discipline of pharmaceutical chemistry. I am also qualified to testify on the scientific aspects of drug substance and drug product characterization and validation activities that are found in the CMC sections of NDAs and ANDAs as required by the FDA, as well as cGMP practices required by the FDA in approved facilities. My background, qualifications, and a complete list of my publications are more fully set out in my curriculum vitae, which is attached to this report as Appendix A.

**B. Prior Testimony**

13. I have testified in prior pharmaceutical patent litigations and other matters. I have testified at trial or by deposition in the following cases within the preceding four years:

- *United States v. Univar USA, Inc.*, C.A. No. 15-cv-00215-MAB. (Ct. Intl. Trade) (deposition).

- *United Therapeutics Corp. and Supernus Pharmaceuticals, Inc., v. Actavis Laboratories FL, Inc.*, C.A. No. 3:16-CV-01817- PGS-LHG (D.N.J.) (deposition).

- *Cipla Ltd v. Sunovion Pharmaceuticals Inc.*, C.A. No. 15-424 (LPS) (D. Del.) (deposition).

- *AstraZeneca Pharmaceuticals v. Amneal Pharmaceuticals*, C.A. No. 15-1056-RGA (D. Del.) (deposition).

- *Novo Nordisk v. Teva Pharmaceuticals*, C.A. No. 17-227 (JFB) (SRF) (D. Del.)

- *IBSA Institut Biochimique, v. Teva Pharmaceuticals USA*, C.A. No. 18-555 (RGA) (D. Del.) (deposition)

- *Wyeth Pharmaceuticals, Inc. v. Sun Pharmaceuticals*, C.A. No. 16-1305 (RGA) (D.Del.) (deposition)

- *Pfizer, Inc. v. Zydus Pharmaceuticals*, C.A. No. 17-158 (LPS) (D.Del.) (deposition).

- *Par Pharmaceutical v. Eagle Pharmaceuticals, Inc.*, C. A. No. 18-00823 (CFC) (D.Del.) (deposition and trial)

- *Baxalta Inc., Baxalta US Inc., and Nektar Therapeutics v. Bayer Healthcare LLC*, C.A. No. 17-1316-RGA (D. Del.) (deposition)

• *Boehringer Ingelheim v. Mankind Pharma LTD, et al.*, C.A. No. 18-1689 (CFC) (D. Del.) (deposition).

• *In Re: Sitagliptin ('708 & '921) Patent Litigation* MDL No. 19-2902 (RGA) (D. Del.) (deposition)

**C. Compensation**

14. I am being compensated at a rate of $600 per hour for work performed on this litigation. I am also being reimbursed for authorized travel and miscellaneous expenses related to my involvement in the case.

15. My compensation is in no way dependent on the outcome of this litigation.

## II. ANTICIPATED TESTIMONY AND MATERIALS CONSIDERED

16. I have been informed by plaintiffs' counsel that the plaintiffs Takeda Pharmaceutical Co. Ltd. and Takeda Pharmaceuticals USA Inc. (collectively "Takeda") have sued defendant Norwich Pharmaceuticals ( "Defendant") for infringement of U.S. Patent Nos. 7,105,486 ("the '486 patent"), 7,223,735 ("the '735 patent"), 7,655,630 ("the '630 patent"), 7,659,253 ("the '253 patent"), No. 7,659,254 ("the '254 patent"), 7,662,787 ("the '787 patent"), 7,662,788 ("the '788 patent"), 7,671,030 ("the '030 patent"), 7,671,031 ("the '031 patent"), 7,674,774 ("the '774 patent"), 7,678,770 ("the '770 patent"), 7,678,771 ("the '771 patent"), 7,687,466 ("the '466 patent"), 7,687,467 ("the '467 patent"), 7,700,561 ("the '561 patent"), 7,713,936 ("the '936 patent"), 7,718,619 ("the '619 patent"), and 7,723,305 ("the '305 patent") (collectively, "the patents-in-suit").

17. In connection with these actions, I have been asked by Takeda's counsel to comment on the meaning of certain terms and phrases of the patents-in-suit, which were identified by the parties for claim construction. I have also been asked by Takeda's counsel to define a person of ordinary skill in the art for the patents-in-suit.

18. In connection with my declaration, I have reviewed the materials referenced herein, as well as those listed in Appendix B. Unless otherwise stated, the exhibits I reference are exhibits attached to the Declaration of Andrew S. Roper, Esq. in Support of Plaintiff Takeda's Opening Claim Construction Brief dated July 27, 2021.

19. The opinions below are based on the education, knowledge, and experience that I have acquired in over more than 30 years of practicing and consulting in the field of organic chemistry and pharmaceutical sciences, as well as the information available to me as of the date of this declaration.

20. I expect to testify at a hearing or at trial as an expert witness on these issues.

## III. SUMMARY OF PROPOSED CLAIM CONSTRUCTIONS

21. The following table identifies the claim terms that I have been asked to opine on and my proposed constructions for each term as understood by a person of ordinary skill in the art. The "Joint Entry No." refers to the numbers in the parties' Joint Claim Construction Statement (ECF No. 77).

| Joint Entry No. | Claim Term | Relevant Patents & Claims[1] | Proposed Construction | Section in Declaration |
|---|---|---|---|---|
| 1 | "L-lysine-d-amphetamine mesylate" *or* "mesylate salt of L-lysine-d-amphetamine" *or* "… wherein said salt is a | '486 patent claim 4<br><br>'735 patent claim 3<br><br>'254 patent claim 3<br><br>'787 patent claim 3<br><br>'788 patent claims 5, 22, 27, 34, 41, 46 | a salt of L-lysine-d-amphetamine containing at least one $CH_3SO_3^-$ anion, which can be obtained from methanesulfonic acid<br><br>(2S)-2,6-diamino-N-[(1S)-1-methyl-2-phenylethyl] hexanamide methanesulfonate<br> | VI.A |

[1] Constructions applicable to each independent claims are also applicable to each corresponding dependent claim.

| | | | | |
|---|---|---|---|---|
| | mesylate salt” | ’030 patent claims 3, 10, 17, 24, 31, 38<br><br>’031 patent claims 6, 22<br><br>’774 patent claims 3, 10, 17, 24, 31, 38<br><br>’770 patent claim 4<br><br>’771 patent claims 3, 10, 17<br><br>’466 patent claim 10<br><br>’467 patent claims 3, 10, 17, 24, 31, 38<br><br>’936 patent claims 6, 22, 38, 54<br><br>’619 patent claims 3, 10, 17, 24, 31, 38<br><br>’305 patent claims 3, 10, 17, 24, 31, 38 | | |
| 14 | “Isolated” | ’787 patent claims 1, 2 | a substance separated from a crude mixture of reactants and/or solvents | VI.C |
| | | *The “Milligram” Terms* | | |
| 16 | “25 to 75 mg” | ’788 patent, claim 12<br><br>’030 patent, claims 1, 22<br><br>’031 patent, claims 13, 29<br><br>’774 patent, claims 1, 22<br><br>’771 patent, claim 1 | Plain and ordinary meaning | VI.D |

| | | | | |
|---|---|---|---|---|
| | | ’467 patent, claims 1, 22<br><br>’936 patent, claims 13, 29, 45, 61<br><br>’619 patent, claims 1, 22<br><br>’305 patent, claims 1, 22 | | |
| 17 | “7.37 to 22.1 mg” | ’030 patent, claims 1, 22<br><br>’774 patent, claims 1, 22<br><br>’771 patent, claim 1<br><br>’467 patent, claims 1, 22<br><br>’619 patent, claims 1, 22<br><br>’305 patent, claims 1, 22 | Plain and ordinary meaning | VI.D |
| 18 | “25 mg” / “75 mg” | ’030 patent, claims 8, 15, 29, 36<br><br>’774 patent, claims 8, 15, 29, 36<br><br>’771 patent, claim 8, 15<br><br>’467 patent, claims 8, 15, 29, 36<br><br>’619 patent, claims 8, 15, 29, 36 | Plain and ordinary meaning | VI.D |

| | | | | |
|---|---|---|---|---|
| | | ’305 patent, claims 8, 15, 29, 36 | | |
| 19 | “30 mg” / “50 mg” / “70 mg” | ’254 patent, claims 5-7<br><br>’770 patent, claims 6-8, 25-27<br><br>’031 patent, claims 14-16, 30-32<br><br>’936 patent, claims 14-16, 30-32, 46-48, 62-64<br><br>’788 patent, claims 13-15<br><br>’466 patent, claims 6-8 | Plain and ordinary meaning | VI.D |
| 20 | “about 30 mg” / “about 50 mg” / “about 70 mg” | ’561 patent claims 2-4 | Plain and ordinary meaning | VI.D |

# IV. BACKGROUND

## A. Claim Construction Legal Standard

22. I have been advised by Takeda’s Counsel that the construction or definition of a patent claim term should be made from the perspective of a **p**erson of **o**rdinary **s**kill in the **a**rt (“POSA”). Counsel has advised me that one can look to two types of evidence to guide claim construction. One should first look to intrinsic evidence, which includes the patent claims, specification, and file history (*i.e.*, the record of the communications between the patent applicants and the U.S. Patent and Trademark Office). I am advised by counsel that I should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the

specification, and the prosecution history. Counsel has further advised me that such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language. I understand from counsel that one may also look to extrinsic evidence (*e.g.*, technical dictionaries, treatises, textbooks, technical publications, and expert testimony) to understand the proper definition of a claim term.

**B. Person of Ordinary Skill in the Art**

23. I understand from Takeda's counsel that terms and phrases in patent claims must be interpreted as they would have been understood by a person of ordinary skill in the art to which the invention related as of the time of the invention ("POSA"). I have been asked by Takeda's counsel to use 2002–2008 as the relevant timeframe.

24. The drug at issue in the patents-in-suit is L-lysine d-amphetamine or salts thereof, including L-lysine-d-amphetamine dimesylate. L-lysine-d-amphetamine dimesylate is a prodrug of d-amphetamine. That is, it is biologically inactive in the body (*in vivo*) until it is converted by the body to d-amphetamine.

25. I have been asked to opine on the type and level of education and expertise of a person of ordinary skill in the art for the patents-in-suit. Counsel for Takeda informed me that I should consider the following factors in constructing the hypothetical person of ordinary skill in the art: (a) the educational level of the inventors; (b) the type of problems encountered in the art; (c) the prior art solutions to those problems; (d) the rapidity with which innovations are made; (e) the sophistication of the technology; and (f) the educational level of workers in the field. I also understand that a person of ordinary skill is a hypothetical person who is presumed to be aware of all pertinent prior art. I also understand that not all factors may be present in every case, and that one or more of the factors may predominate.

26. I have been informed by counsel for Takeda of the educational backgrounds of the following inventors: Travis Mickle obtained a Ph.D. in chemistry from the University of Iowa; Christopher Lauderback obtained a Ph.D. in chemistry from the University of Kentucky in 2001; Suma Krishnan obtained a M.S. in organic chemistry from Villanova University; Barney Bishop obtained a Ph.D. in chemistry from the University of North Carolina at Chapel Hill in 1997; Robert Oberlender obtained a Ph.D. in medicinal chemistry from Purdue University in 1989; Thomas Piccariello obtained a Ph.D. in Chemistry from Virginia Polytechnic Institute and State University in 1989; Christopher Verbicky obtained a Ph.D. in synthetic organic chemistry from the University of New Hampshire in 1999; James Scott Moncrief obtained a Ph.D. in Microbiology and Immunology from the University of Texas in 1992; Bernhard J. Paul obtained a Ph.D. in chemistry from the University of Florida in 2002.

27. In my opinion, as of the relevant timeframe, a POSA for the patents-in-suit is a person with an academic degree of Doctor of Philosophy (or equivalent degree) in a field related to pharmaceutical sciences with approximately 1 year of relevant experience or, alternatively, a person with commensurate experience.

28. I understand that Defendant defined a POSA for the patents-in-suit as:

> A person who at the relevant time held a Ph.D., or equivalent degree, in a field related to pharmaceutical sciences, and at least two years' experience in drug discovery and formulation, including in the development of potential drug candidates. The POSA may also have at least two years of experience in pharmaceutical formulation, analytical chemistry, pharmacology, pharmaceutics, crystallography, and/or the treatment of ADHD or consult with others having a Ph.D., Pharm.D., and/or M.D. degree and the requisite experience.

(ECF No. 77 at 13). For the purposes of claim construction, my opinions would not change if the Court adopts Defendant's proposed definition of a POSA.

## V. AGREED UPON TERMS

29. I understand from Takeda's counsel that the parties have agreed to the constructions of the following terms and such terms are identified in the parties' Joint Claim Construction Statement (ECF No. 77, Sec. I) and in a letter dated July 21, 2021:

| Claim Term | Patent Claims | Agreed Upon Construction |
|---|---|---|
| "alternative routes of administration" | '735 patent claims 1, 18 | "parenteral routes of administration often employed in illicit use" |
| "bioavailability" | '735 patent, claims 1, 11, 18<br><br>'936 patent, claims 1, 17, 33, 49<br><br>'561 patent, claims 8-9 | "extent of absorption" |
| "spiking" | '735 patent claim 11<br><br>'936 patent claims 1, 33 | "rapidly increasing blood serum concentrations" |
| "steady-state serum release curve" | '735 patent claim 11<br><br>'936 patent claims 1, 17, 33, 49 | "a serum release curve which shows a relatively constant and prolonged rate of appearance of the active" |
| "The compound, L-lysine-d-amphetamine dimesylate" | '630 patent claim 1 | "L-lysine-d-amphetamine dimesylate (that may have a water content)" |
| "L-lysine-d-amphetamine" | '486 patent, claims 1, 3, 4, 7-10<br><br>'735 patent, claims 1, 3, 9-15, 18<br><br>'630 patent, claim 1<br><br>'254 patent, all claims<br><br>'787 patent, claims 1-3, 5<br><br>'788 patent, claims 1, 8, 16, 20, 21, 25, 26, 30, 33, 38, 39, 40, 44, 45 | "(2S)-2,6-diamino-N-[(1S)-1-methyl-2-phenylethyl] hexanamide<br> "<br><br>The parties agree that the construction is understood in light of the Court's conclusion in the Prior Litigation and that the construction "does not include protected forms." *See Shire LLC v. Amneal Pharms.,* |

| | | |
|---|---|---|
| | ’030 patent, claims 1, 2, 8, 9, 15, 16, 22, 23, 29, 30, 36, 37<br><br>’031 patent, claims 1, 5, 9, 10, 17, 21, 25, 26<br><br>’774 patent, claims 1, 2, 8, 9, 15, 16, 22, 23, 29, 30, 36, 37<br><br>’770 patent, claims 1, 4-11, 13, 25-27<br><br>’771 patent, claims 1, 2, 8, 9, 15, 16<br><br>’466 patent, claims 1, 3-9, 12<br><br>’467 patent, claims 1, 2, 8, 9, 15, 16, 22, 23, 29, 30, 36, 37<br><br>’561 patent, claims 1-4<br><br>’936 patent, claims 1, 5, 9, 10, 17, 21, 25, 26, 33, 37, 41, 42, 49, 53, 57, 58<br><br>’619 patent, claims 1, 2, 8, 9, 15, 16, 22, 23, 29, 30, 36, 37 | *LLC*, 2013 Markman 4045622, *3-5 (D.N.J. 2013). |
| “L-lysine-d-amphetamine dimesylate”<br>*or*<br>“lisdexamphetamine dimesylate”<br>*or*<br>“… wherein said salt is a dimesylate salt” | ’630 patent claim 1<br><br>’253 patent, all claims<br><br>’254 patent claim 4<br>’788 patent claims 6, 23, 28, 35, 42, 47<br><br>’030 patent claims 4, 11, 18, 25, 32, 39<br><br>’031 patent claims 7, 23 | “a salt of L-lysine-d-amphetamine containing two $CH_3SO_3^-$ anion[s], which can be obtained from methanesulfonic acid”<br><br>(2S)-2,6-diamino-N-[(1S)-1-methyl-2-phenylethyl] hexanamide dimethanesulfonate<br> |

| | | |
|---|---|---|
| | ’774 patent claims 4, 11, 18, 25, 32, 39<br><br>’770 patent claim 5<br><br>’771 patent claims 4, 11, 18<br><br>’466 patent claims 11, 12<br><br>’467 patent claims 4, 11, 18, 25, 32, 39<br><br>’561 patent claims 2, 3, 4<br><br>’936 patent claims 7, 23, 39, 55<br><br>’619 patent claims 4, 11, 18, 25, 32, 39<br><br>’305 patent claims 4, 11, 18, 25, 32, 39 | |
| “$d_{50}$ particle size ranging from about 25 to about 90 µm” | ’253 patent claim 8(c) | “$d_{90}$ particle size ranging from about 25 to about 90 µm” |
| “an X-ray powder diffraction pattern substantially as shown in Fig. 77” | ’253 patent claim 2 | “X-ray powder diffraction pattern approximately as shown in FIG. 77”<br><br>The parties agree that the construction does not require a specific numerical boundary in accordance with the Court’s statement in Prior Litigation Markman Hearing. (TAKVYV01745310 at 337-338 (“I will make explicit the Court’s conclusion that there are no numerical limitations on it and that using the word “substantially” will have its ordinary usage as being a term - |

| | | |
|---|---|---|
| | | - as a nonspecific term of approximation that avoids numerical boundary and doesn't need any specific interpretation because that's what the ordinary usage would be.")) |
| "about 95% by weight of crystalline lisdexamphetamine dimesylate, based upon 100% total weight of lisdexamphetamine dimesylate" | '253 patent claim 12 | "crystalline lisdexamphetamine dimesylate that has about 95% by weight chemical purity—wherein 'about' refers to a variation of ± 10% of the value provided" |
| "administering" / "orally administer" / "administered" | '486 patent, claims 1-3, 6-10, 12-15<br><br>'735 patent, claims 1, 17, 18<br><br>'253 patent, claim 13<br><br>'254 patent, all claims<br><br>'030 patent, claims 1, 8, 15, 22, 29, 36, 43<br><br>'031 patent, claims 1, 17<br><br>'774 patent, claims 1, 8, 15, 22, 29, 36, 43<br><br>'770 patent, claims 1, 4-9, 13, 25-27<br><br>'771 patent, claims 1, 8, 15, 22<br><br>'467 patent, claims 1, 8, 15, 22, 29, 36, 43<br><br>'936 patent, claims 1, 17, 33, 49<br><br>'619 patent, claims 1, 8, 15, 22, 29, 36, 43 | Plain and ordinary meaning. The parties agree that the construction is understood in light of the Court's decision on "administering" and "orally administering" in the Prior Litigation and that the construction is not limited to "physically delivering into the body of the patient." *Shire LLC v. Amneal Pharms., LLC*, 2013 Markman 4045622, *17-18, (D.N.J. 2013). |

| | | |
|---|---|---|
| | ’305 patent, claims 1, 8, 15, 22, 29, 36, 43<br><br>’788 patent, claim 30, 39, 44 | |
| $P2_1/a$ | ’253 patent claim 7 | $P2_1$ |

## VI. PROPOSED CLAIM CONSTRUCTIONS

### A. Claim Terms Relating to L-lysine-d-amphetamine Mesylate

30. The following table compares my proposed constructions with Defendant’s proposed construction for Term No. 1 relating to mesylate salts of L-lysine-d-amphetamine:

| Joint Entry No. | Claim Term | Takeda’s Proposed Construction | Norwich’s Proposed Construction |
|---|---|---|---|
| 1 | “L-lysine-d-amphetamine mesylate”<br>*or*<br>“mesylate salt of L-lysine-d-amphetamine”<br>*or*<br>“wherein said salt is a mesylate salt” | a salt of L-lysine-d-amphetamine containing at least one $CH_3SO_3^-$ anion, which can be obtained from methanesulfonic acid<br><br>(2S)-2,6-diamino-N-[(1S)-1-methyl-2-phenylethyl] hexanamide methanesulfonate<br> | “mesylate” / “a mesylate salt” means “a salt with any number of mesylate ions associated with it.” No further construction required other than the construction of “L-lysine-d-amphetamine” at term 3. |

31. A POSA would have understood terms relating to L-lysine-d-amphetamine mesylate to mean “a salt of L-lysine-d-amphetamine containing at least one $CH_3SO_3^-$ anion, which can be obtained from methanesulfonic acid,” with the chemical name (2*S*)-2,6-diamino-*N*-[(1*S*)-1-methyl-2-phenylethyl] hexanamide methanesulfonate and structure:



wherein "[n]" represents the number of $CH_3SO_3^-$ anions.

32. With respect to the word "mesylate" in this term, a POSA would have understood that a mesylate salt of L-lysine-d-amphetamine is a salt of L-lysine-d-amphetamine containing at least one $CH_3SO_3^-$ anion.

33. According to the generally applicable Brønsted-Lowry Acid-Base Theory, L-lysine-d-amphetamine is a base, in that it has the propensity to accept protons (i.e., positively charged hydrogen ions) from other compounds. In contrast, acids are chemical species that have the propensity to donate protons to other molecules. When combined with an acid in solution, a base such as L-lysine-d-amphetamine may undergo a proton transfer reaction with that acid to form a salt. Whether or not that proton transfer reaction occurs in solution depends in part on the strength of the acid that is combined in solution with a base such as L-lysine-d-amphetamine.

34. The propensity of an acid to donate a proton and conversely a base to accept a proton may be referred to as the "strength" of an acid or a base. Stronger acids have a greater thermodynamic driving force to donate a proton than weaker acids, and stronger bases will have a greater propensity to accept a proton compared to weaker bases. The strengths of acids and bases may also be quantitatively assessed through the dissociation constant ($K_a$) of the compound according to the equation:

$$K_a = [A^-][H^+]/[HA]$$

where,

$K_a$ = acid dissociation constant
$[A^-]$ = concentration of conjugate base
$[H^+]$ = concentration of protons
$[HA]$ = concentration of acid

35. Stronger acids will provide a greater concentration of protons in solution and as a result have larger $K_a$ values. Chemists and POSAs generally refer to dissociation constants in

terms of their pKa values. The numerical value corresponds to the negative logarithm of the acid dissociation constant for the compound. Stronger acids will have lower pKa values than weaker ones. The pKa values are specific to the solvents used to dissolve the acids. Water is by far the most common solvent to measure and express pKa values for acids. The strength of bases may also be expressed by the pKa values of the protonated forms of the bases, which are referred to as the "conjugate acid" forms.

36. L-lysine-d-amphetamine has two basic sites on the molecule that can accept protons from acids to form salts. These sites are located on the amine ($-NH_2$) functional groups of the molecule. A POSA would recognize that these sites are capable of being protonated in solution with an acid that is strong enough to transfer a proton to either one or both of the amine functional groups. Since L-lysine-d-amphetamine has two basic sites, there will be two pKa values associated with the molecule. A POSA, in view of the patents-in-suit, would recognize that the primary amine functional groups are basic and will react with certain acids. The below figure from the '253 patent illustrates the dimesylate salt of L-lysine-d-amphetamine where two methanesulfonic acid molecules are associated with the two primary amine functional groups. Although the structure is illustrated with individual acid and base molecules, a POSA would understand that it would contain the mesylate ions ($CH_3SO_3^-$) and the protonated amine functional groups that contain a positive charge on the nitrogen atoms ($-NH_3^+$).




**L-Lys-D-amphetamine dimesylate (NRP104)**
**$C_{17}H_{33}N_3O_7S_2$**
**Mol. Wt.: 455.59**

(Ex. 4, '253 patent, Fig. 2).

37. A POSA would note that the specification explains that L-lysine-d-amphetamine can be described by the chemical name "2,6-diaminohexanoic acid-(1-methyl-2-phenylethyl)-amide." (*See, e.g.*, Ex. 7, '788 patent, col.18 ll.27-29). A POSA would have understood that this is synonymous with "(2*S*)-2,6-diamino-*N*-[(1*S*)-1-methyl-2-phenylethyl] hexanamide."

38. Methanesulfonic acid is a strong organic acid with a pKa of -1.2. (Ex. 57, Stahl, NORWICH_LDX_000003778 at 3810). The structural formula of methanesulfonic acid is $CH_3SO_3H$. (Ex. 57, NORWICH_LDX_000003778 at 3810). The conjugate base of methanesulfonic acid is referred to as a methanesulfonate anion: $CH_3SO_3^-$. This anion is also referred to as a "mesylate" ion. (Ex. 57, NORWICH_LDX_000003778 at 3810).

39. Based on these disclosures, a POSA would have understood the term "mesylate" in accordance with its common understanding in the art, such that L-lysine-d-amphetamine mesylate is a salt of L-lysine-d-amphetamine containing at least one $CH_3SO_3^-$ anion, which can be obtained from methanesulfonic acid. Synonymously, a POSA would understand Term 1 as having the chemical name "(2S)-2,6-diamino-N-[(1S)-1-methyl-2-phenylethyl] hexanamide methanesulfonate" and structure:




40. A POSA would also note that the specification explains that "Preferably, the amphetamine is an amphetamine salt" and that "Pharmaceutically acceptable salts, e.g., non-toxic, inorganic and organic acid addition salts, are known in the art." (*See, e.g.*, Ex. 7, '788 patent, col.7 ll.28-30). The specification further states that "Exemplary salts include … mesylate." (*See, e.g.*, Ex. 7, '788 patent, col.7 ll.30-44 (citing Berge et al. (1977) "Pharmaceutical Salts", J. Pharm. Sci. 66:1-19)). The specification also states that "A preferred

amphetamine salt is the mesylate salt (e.g., as in L-lysine-d-amphetamine-dimesylate).” (*See, e.g.*, Ex. 7, ’788 patent, col.7 ll.54-56). This passage supports that a POSA would understand the term “mesylate” in the context of the amphetamine, e.g., L-lysine-d-amphetamine, with which it is associated. A POSA would have understood the term “mesylate” in accordance with its common understanding in the art, such that L-lysine-d-amphetamine mesylate is a salt of L-lysine-d-amphetamine containing at least one $CH_3SO_3^-$ anion.

41. The above passage indicates that the term “mesylate” is to be understood in the context of “the amphetamine” with which it is associated (i.e., L-lysine-d-amphetamine). Unlike Defendant’s proposed construction, this passage of the patents-in-suit does not describe “a salt with any number of mesylate ions associated with it.”

42. My opinion is also consistent with the examples in the patents-in-suit. In particular, Example 2 describes the preparation of a “Mesylate Salt” of L-lysine-d-amphetamine. Example 2 explains that L-lysine-d-amphetamine dimesylate “can be prepared by using methanesulfonic acid.” (*See, e.g.*, Ex. 7, ’788 patent, col.21 ll.4-6). Example 2 involves the preparation of L-lysine-d-amphetamine dimesylate, which is a mesylate salt of L-lysine-d-amphetamine containing at least one $CH_3SO_3^-$ anion.

43. My opinion is also consistent with the figures in the patents-in-suit. For example, Figure 2 of the ’788 patent, which is referenced in Example 2 of this patent, represents the synthetic scheme of L-lysine-d-amphetamine dimesylate. (*See, e.g.*, Ex. 7, ’788 patent, col.2 l.32). Figure 2 depicts a salt of L-lysine-d-amphetamine containing two $CH_3SO_3^-$ (mesylate) anion[s] (i.e., “at least one (mesylate) anion”) obtained from methanesulfonic acid:



L-Lys-D-amphetamine dimesylate (NRP104)
$C_{17}H_{33}N_3O_7S_2$
Mol. Wt.: 455.59

(Ex. 4, '253 patent, Fig. 2). A POSA would readily understand that the above chemical structure is exemplary of a mesylate salt of L-lysine-d-amphetamine containing two $CH_3SO_3^-$ anions.

44. My opinion is supported by the file histories of the patents-in-suit, which identify L-lysine-d-amphetamine by its structure:



L–lysine–d–amphetamine

(*See, e.g.*, Ex. 24, '787 patent file history TAKVYV01708704 at 1714902). A POSA would understand that L-lysine-d-amphetamine, having the chemical structure as agreed above, can accept a minimum of one and a maximum of two $CH_3SO_3^-$ anions.

45. My opinion is consistent with the parties' agreement concerning the constructions of "L-lysine-d-amphetamine" and "L-lysine-d-amphetamine dimesylate" (and synonymous terms). The parties have agreed that the proper construction of the term "L-lysine-d-amphetamine" is "(2S)-2,6-diamino-N-[(1S)-1-methyl-2-phenylethyl] hexanamide" having the structure



(ECF No. 77 at 2-3).[2] This is the same structure included in the file histories of the patents-in-suit for L-lysine-d-amphetamine, and supports Takeda's proposed construction for the reasons identified above (¶ 44).

46. The parties have also agreed that the proper construction of the terms "L-lysine-d-amphetamine dimesylate" or "lisdexamphetamine[3] dimesylate" or "… wherein said salt is a dimesylate salt" is "a salt of L-lysine-d-amphetamine containing two $CH_3SO_3^-$ anion[s], which can be obtained from methanesulfonic acid" and having the chemical name "(2S)-2,6-diamino-N-[(1S)-1-methyl-2-phenylethyl] hexanamide dimethanesulfonate" and further having the structure



(ECF No. 77 at 3-4). Takeda's proposed construction for the "mesylate" terms mirrors this agreed-upon construction, but uses the term "n" (rather than "2") to denote that L-lysine-d-amphetamine mesylate may have "one or more" $CH_3SO_3^-$ anions as can be accepted by L-lysine-d-amphetamine (i.e., 1 or 2).

47. [redacted]

[2] The parties agree that the construction is understood in light of the Court's conclusion in the Prior Litigation and that the construction "does not include protected forms." *See Shire LLC v. Amneal Pharms., LLC*, 2013 WL 4045622, *3-5 (D.N.J. 2013).

[3] As explained in the specifications of the patents-in-suit, L-lysine-d-amphetamine is also known as lisdexamfetamine. (*See, e.g.*, Ex. 7, '788 patent, col.18 ll.27-29).

[redacted]

(Ex. 47, NPILDX_000000583 at 585 (red emphasis added)). A POSA would understand that [redacted] As illustrated by [redacted], which is consistent with the molecular structure proposed by Takeda, a POSA would understand that L-lysine-d-amphetamine can theoretically accept a $CH_3SO_3^-$ anion at either or both of the protonated amine groups ($-NH_3^+$) on the L-lysine-d-amphetamine molecule—not that a mesylate salt of L-lysine-d-amphetamine can have "any number of mesylate ions associated with it."

48. [redacted]

(Ex. 45, NPILDX_000000129 at 146). [redacted]. The accompanying description in

[redacted] (Ex. 45, NPILDX_000000129 at 145-46). A POSA would understand Defendant's description of its active ingredient to be consistent with Takeda's proposed construction, i.e., "a salt of L-lysine-d-amphetamine containing at least one $CH_3SO_3^-$ anion, which can be obtained from methanesulfonic acid," with the chemical name (2S)-2,6-diamino-N-[(1S)-1-methyl-2-phenylethyl] hexanamide methanesulfonate.

49. I understand that Defendant proposes to construe the term "mesylate" and/or "a mesylate salt" to mean "a salt with any number of mesylate ions associated with it." (ECF No. 77 at 13, Term No. 1). Defendant also states that "No further construction required other than the construction of 'L-lysine-d-amphetamine' at term 3." I disagree with Defendant's proposed construction.

50. In the context of the patents-in-suit, a POSA would understand the term "mesylate" in the context of L-lysine-d-amphetamine. Each disputed claim recites the term "mesylate" in the context of "L-lysine-d-amphetamine." A POSA would not understand the terms "mesylate" and "L-lysine-d-amphetamine" independently from one another.

51. As set forth above (¶¶ 45-46), the parties' agreement concerning the construction of "L-lysine-d-amphetamine" supports Takeda's proposed construction.

52. Defendant's proposed construction of "mesylate" and/or "a mesylate salt" to mean "a salt with any number of mesylate ions associated with it" is unnecessarily broad. Defendant's proposed construction encompasses compounds having "any number" of mesylate ions. It appears Defendant's use of "[a]ny number" could refer to infinite values, including zero,

and fractions of mesylate anions. A POSA would not understand term 1 to have such a broad construction that produces an illogical result or one that is contrary to scientific principles.

### B. "Isolated"

53. The following table compares my proposed constructions with Defendant's proposed construction for Term No. 14: "isolated."

| Joint Entry No. | Claim Term | Takeda's Proposed Construction | Norwich's Proposed Construction |
|---|---|---|---|
| 14 | "isolated" | a substance separated from a crude mixture of reactants and/or solvents | non-salt form |

54. A POSA would have understood the term "isolated" as used in the patents-in-suit to mean "a substance separated from a crude mixture of reactants and/or solvents." This construction is consistent with the term's plain and ordinary meaning. In the Prior Litigation, all parties agreed to the same construction: "a substance separated from a crude mixture of reactants and/or solvents." (Ex. 46, TAKVYV01745249 at 254).

55. My opinion is consistent with the specification and examples of the patents-in-suit. For example, the only use of the word "isolated" in the specification occurs in the context of Example 2. Example 2 of the '787 patent describes the "synthesis of L-lysine-d-amphetamine." The synthesis involves two steps: (a) coupling and (b) deprotection. The term "isolated" appears in the "coupling" step. (*See* Ex. 6, '787 patent col.20 l.64-col.21 l.2 ("The crude product was dissolved in ethyl acetate and loaded on to a flash column (7 cm wide, filled to 24 cm with silica) and eluted with ethyl acetate. The product was **isolated**; the solvent reduced by rotary evaporation and the purified protected amide was dried by high-vac to obtain a white solid") (emphasis added)). A POSA would understand that the term "isolated" in the specification of the '787 patent refers to the separation of the product from a crude mixture using chromatography. The purification procedure described in Example 2 (*id*) provides a solution of the product in ethyl acetate, which is referred to by the inventors as being isolated. This understanding is consistent with Takeda's proposed construction.

56. My opinion is consistent with the file history of the ’787 patent. The word “isolated” was added by an Examiner’s Amendment on Sept. 20, 2009. By way of background, the claims faced a rejection on November 12, 2008 over the NL 6414901 reference. (Ex. 24, TAKVYV01708704 at 8913). The Examiner’s rejection stated that “It would have been obvious to one of ordinary skill in the art at the time the claimed invention was made to use a unprotected L-lysine-d-amphetamine in the compositions of NL 6414901 because NL 6414901 advantageously teach the use of either protected or unprotected Lys-Amp compounds and the selection of making/using unprotected L-lysine-d-amphetamine is merely a matter of routine optimization by one of ordinary skill in the art and a factor for consideration if needed to prevent the reactive N alpha or N epsilon groups from reacting with other compounds in solution (or unprotecting if not of concern) depending on the desired effects.” (Ex. 24, ’787 file history, TAKVYV01708704 at 8915)

57. In Response dated May 12, 2009, the applicants directed the Examiner to the prosecution of a related application, where the Examiner found that the NL 6414901 reference was “no longer deemed to reasonably teach or suggest or provide motivation for making/using a pharmaceutical composition comprising an unprotected prodrug consisting of L-lysine-d-amphetamine.” (Ex. 24,’787 File History, TAKVYV01708704 at 1714903).

58. The Examiner amended the claims to include the term “isolated” on September 20, 2009. (Ex. 24, ’787 File History at TAKVYV01708704 at 1715316). The Examiner’s Reasons for Allowance stated that “[t]he prior art of record (NL 6414901), drawn to a protected L-Lys-d-amphetamine-Tosyl, was determined to be a prodrug of the presently claimed UNprotected L-lys-d-amphetamine. … Counterintuitively, Applicant has provided by description and declaration unexpected results showing that the unprotected form carries out the intent of the

invention. Thus, an intermediate of the protected end product of '901 not being described as an end product itself (what the present invention is in essence, an intermediate), there would have been no suggestion/motivation/predictability in the '901 alone or in combination, for one of ordinary skill in the art to have arrived at the presently claimed UNprotected, intermediate form thereof." (*Id.* at TAKVYV01715316-17). Thus, through the amendment, it appears that the Examiner was attempting to distinguish the claimed invention from a potential intermediate compound that he implied could have been hypothetically prepared as part of the synthetic procedure for a different end-product, i.e., N-tosyl-L-lysine-d-amphetamine. The word "isolated" seems to have been suggested by the Examiner to avoid covering L-lysine-d-amphetamine that might be formed in a hypothetical reaction scheme for the synthesis of the N-tosyl-L-lysine-d-amphetamine end-product.

59. Although the applicants disagreed with the Examiner's analysis of the NL 6414901 reference, including by stating that "there is no evidence of record that $N^a$-tosyl-L-lysine-[D(+)-1-phenyl-propy1-2]-amide is an intermediate form of L-lys-d-amphetamine or vice versa" (Ex. 24, '787 File History, TAKVYV01708704 at 1715694), they nonetheless permitted the insertion of the word "isolated" into the claim. The effect of the limitation is to exclude potential chemical intermediates formed in a potential synthetic pathway alongside reactants and/or solvents during the synthesis of another end-product. Thus, the term is properly construed to mean "a substance separated from a crude mixture of reactants and/or solvents."

60. My opinion is further supported by the definition of the term "isolate" in the American Heritage Desk Dictionary, which states "to set apart or cut off from a group or whole." (*See* Ex. 42, TAKVYV01743210 at 214). A POSA would understand this definition to align with

Takeda's proposed construction, wherein the "group or whole" equates to the "crude mixture of reactants and/or solvents".

61. I understand that Defendant proposes to construe this term to mean "non-salt form." I disagree with Defendant's proposed construction because a POSA would not understand the term "isolated" as used in the art to refer to "non-salt" (i.e., "free base") forms, nor does the intrinsic record support Defendant's proposed construction.

62. Example 2 of the '787 patent is the only instance where the term "isolated" appears in the specification. Example 2 produces a hydrochloride salt, and therefore, a POSA would not understand Defendant's proposed construction to be correct. In the reaction described in Example 2, 35 mmol of amphetamine is coupled with 35 mmol of protected lysine. The product of this coupling is, at most, 35 mmol L-lysine-d-amphetamine. Subsequently, the patent describes the next step of deprotection using 200 mmol of hydrochloric acid (HCl). Because the protected amino acid has two BOC protecting groups, only at most 70 mmol of acid would be needed to carry out the deprotection. The mechanism of acid deprotection of BOC groups is catalytic, so in theory no acid is consumed. Even if acid is consumed, only 70 mmol of acid would be consumed. This leaves 130 mmol of HCl, which a POSA would understand to be in excess, and more than enough to form the HCl salt form of the product. Additionally, a POSA would understand that the isolation conditions described in Example 2 would not form the free base form of the compound, but rather would form the dihydrochloride salt.

63. References cited in the file history of the '787 patent use the term "isolated" consistent with Takeda's proposed construction:

- Ex. 24, TAKVYV01708704 at 1708948 ("PepT1 has been isolated from various other species . . . .");

- Ex. 24, TAKVYV01708704 at 1709033 ("N-carboxy L-glutamic anhydride (Leuchs anhydride III) may be isolated from the reaction mixture . . . .");
- Ex. 24, TAKVYV01708704 at 1709034 ("practically pure pyroglutaniic acid was isolated together with a small amount of glutamic acid . . . .");
- Ex. 24, TAKVYV01708704 at 1709224 ("Three different products [] were identified separated and isolated . . . .");
- Ex. 24, TAKVYV01708704 at 1709628 ("The resultant white precipitate was isolated by centrifugation . . . .");
- Ex. 24, TAKVYV01708704 at 1709336 ("pure polymer was isolated from water solution by freeze drying . . . ."); and
- Ex. 24, TAKVYV01708704 at 1715276 ("The product was isolated by filtration, washed with IMS (2 x 12m1) and dried in vacuo at 40 to 45°C to yield the title compound [a 'hemisulfate salt'] . . . .").

64. Additionally, a POSA would generally use the term "free base" to designate a non-salt form of a compound. For the patents-in-suit, the inventors use the term "free base" to designate a non-salt form. (Ex. 6, '787 patent at col.20 ll.52, 60).

65. A POSA would have viewed the term "isolated" to have a different meaning than the term "free base." A POSA would have understood that both a freebase- and a salt-form could be "isolated" by separating the substance from a crude mixture of reactants and/or solvents.

### C. Claim Terms Related to Milligram Amounts

66. A POSA would have understood the milligram amounts of a pharmaceutical ingredient (*e.g.*, "25 mg") according to its plain and ordinary meaning. The following table compares my proposed constructions with Defendant's proposed constructions for certain claim terms in the patents-in-suit that list milligram amounts:

| Joint Entry No. | Claim Term | Takeda's Proposed Construction | Norwich's Proposed Construction |
|---|---|---|---|
| 16 | "25 to 75 mg" | Plain and ordinary meaning | No construction needed; plain and ordinary meaning, i.e., "precisely 25 mg to precisely 75 mg" |
| 17 | "7.37 to 22.1 mg" | Plain and ordinary meaning | No construction needed; plain and ordinary meaning, i.e., "precisely 7.37 mg to precisely 22.1 mg" |
| 18 | "25 mg" / "75 mg" | Plain and ordinary meaning | No construction needed; plain and ordinary meaning, i.e., "precisely [25 mg / 75 mg]" |
| 19 | "30 mg" / "50 mg" / "70 mg" | Plain and ordinary meaning | No construction needed; plain and ordinary meaning, i.e., "precisely [30 mg / 50 mg / 70 mg]" |
| 20 | "about 30 mg" / "about 50 mg" / "about 70 mg" | Plain and ordinary meaning | Plain and ordinary meaning, i.e., "approximately [30 mg / 50 mg / 70 mg]" |

67. I understand that Defendant proposes to construe the claim terms that identify milligram amounts to mean "precisely" the milligram amount. (ECF No. 77, Ex. A at 78-94 Joint Entry Nos. 16-20). I disagree with Defendant's proposed construction.

68. My opinion is supported by the context of the claims themselves. For example, claims 1 and 8 of the '030 patent read (emphasis added):

> 1. A composition comprising an amount of from **25 to 75 mg** of L-lysine-d-amphetamine or a salt thereof and having an amphetamine base amount of **from 7.37 to 22.1 mg** of said amphetamine, said L-lysine-d-amphetamine or a salt thereof providing a mean $AUC_{0\text{-}12\ h}$ (ng h/mL) from 205.4±42.5 to 611.5±104.5, a mean $AUC_{last}$ (ng h/mL) from 396.7±84.8 to 1237.0±194.0, a mean $AUC_{inf}$ (ng h/mL) from 415.0±80.1 to 1259.5±191.3, a mean $C_{max}$ (ng/mL) from 25.0±5.6 to 74.0±12.9, a mean $T_{max}$ (hours) from 3.1±0.876 to 3.9±1.0, and a mean $T_{1/2}$ (hours) from 9.68±1.43 to 10.3±1.7 of amphetamine when orally administered to a human subject.

> * * *

> 8. A composition comprising **25 mg** of L-lysine-d-amphetamine or a salt thereof and having an amphetamine base amount of **7.37 mg** of said amphetamine, said L-lysine-d-amphetamine or a salt thereof providing a mean $AUC_{0\text{-}12\ h}$ (ng h/mL) of 205.4±42.5, a mean $AUC_{last}$ (ng h/mL) of 396.7±84.8, a mean $AUC_{inf}$ (ng h/mL) of 415.0±80.1, a mean $C_{max}$ (ng/mL) of 25.0±5.6, a mean $T_{max}$ (hours) of 3.1±0.876, and a mean $T_{1/2}$ (hours) of 9.68±1.43 of amphetamine when orally administered to a human subject.

69. A POSA would have understood that the term "25 mg" refers to the strength of the dose. In other words, it refers to the amount of drug substance that a manufacturer claims is present in each dose. However, this term does not refer to "precisely" 25 mg, as it would have been understood by a POSA that there is some variability in this value. The reason for such variability arises from the variability in the purity of the drug substances, manufacturing processes, and analytical testing used for the manufacture of drug products.

70. Claims 1 and 8 of the '030 patent recite an amphetamine base amount of 7.37 to 22.1 mg that relates back to L-lysine-d-amphetamine or a salt thereof in amounts of 25 to 75 mg.

71. Table 2 of the '030 patent relates the theoretical weight amount of d-amphetamine base that is incorporated into the L-lysine-d-amphetamine dimesylate prodrug based on the molecular weights of those two compounds. The inventors specify a molecular weight of 455.59 g/mol for L-lysine-d-amphetamine, and the molecular weight of d-amphetamine is 135.21

g/mol.[4] Table 2 contains a listing of various weight amounts of L-lysine-d-amphetamine and the corresponding amounts of d-amphetamine based on a 29.5% weight ratio.

72. Although Table 2 of the '030 patent describes L-lysine-d-amphetamine as containing 29.5% d-amphetamine, a POSA would recognize that the actual value based on the theoretical molecular weights for the two compounds is closer to 29.7%: (135.21/455.59 x 100% = 29.678%). However, the weight values in claims 1 and 8 correspond to values of d-amphetamine that use the 29.5% factor as specified in Table 2: 7.37 mg /25 mg x 100% = 29.5%; 22.1 mg/75 mg x 100% = 29.5%. A POSA would understand the numerical values provided in claims 1 and 8 of the '030 patent to contain some variability that is associated with the particular value that is used to relate the d-amphetamine base amount to the weight of L-lysine-d-amphetamine.

73. It is also my opinion that a POSA understands that there is variability in the purity of the active pharmaceutical ingredient itself. Therefore, it would not be surprising to a POSA if the reported d-amphetamine base amount was slightly different than the precise theoretical amount determined from the molecular formulas.

74. [redacted] (*See, e.g.*, Ex. 49, NPILDX_000002746 at 2747; Ex. 50,

---

[4] The molecular formula of d-amphetamine is $C_9H_{13}N$. Using the atomic weight values of C = 12.011, H = 1.008, N = 14.007 provides a molecular weight of (12.011 x 9) + (1.008 x 13) + (14.007 x 1) = 135.21 g/mol.

NPILDX_000002753 at 2754; Ex. 51, NPILDX_000002760 at 2761; Ex. 52, NPILDX_000002767 at 2768; Ex. 53, NPILDX_000002774 at 2775; Ex. 54, NPILDX_000002781 at 2782; Ex. 55, NPILDX_000002788 at 2789). [redacted] (Ex. 58, Norwich's Objections and Responses to Plaintiffs' First Set of Requests for Admission (Jan. 19, 2021) at 9 [redacted]); Ex. 48, NPILDX_000000427 at 431-434 ([redacted])). Thus, Defendant understands that, for example, a label claim of "30 mg" would not require a milligram amount that is "precisely" 30 mg.

75. Likewise, a POSA would understand that claims reciting "about" a specified milligram value (i.e., '561 patent claims 2-4 (reciting "about 30 mg", "about 50 mg", and "about 70 mg", respectively)) in accordance with their plain an ordinary meaning. Such claims require "about" the specified milligram amount, and therefore, such claims have some variability in this value that is greater than the variability associated with the recitation of the milligram amount alone.

76. I have found nothing in the patents-in-suit or their file histories that is inconsistent with the ordinary and customary meaning of the claim terms that identify milligram amounts as I have explained above.

77. Defendant's proposed construction of the "milligram" amount terms is inconsistent with the claims themselves and the patents-in-suit. This may be illustrated by examining the independent claims of the '030, '771, '774, '467, '619, and '305 patents. For example, claim 1 of the '030 patent reads:

> 1. A composition comprising an amount of from 25 to 75 mg of L-lysine-d-amphetamine or a salt thereof and having an amphetamine base amount of from 7.37 to 22.1 mg of said amphetamine . . . .

In the context of this claim, as described above, a POSA would have understood that "and having an amphetamine base amount" means "and having an amount of d-amphetamine component of L-lysine-d-amphetamine or a salt thereof." A POSA would have understood that the amount of the d-amphetamine component varies in proportion to the amount of L-lysine-d-amphetamine (or a salt thereof). (*See, e.g.*, Ex. 8, '030 patent, Table 2). In claim 1 of the '030 patent quoted above, the place value for the last digit shown and the number of significant figures differ for the amphetamine base amount and the amount of L-lysine-d-amphetamine (or a salt thereof). A POSA would have understood that the patents-in-suit and their claims were not drafted with an eye towards the significant figures of the numerical values, and therefore were not drafted to reflect "precisely" the recited values. Thus, Defendant's proposed construction is inconsistent with the context of the term "7.37 to 22.1 mg" in this claim.

78. I understand that the Court construed the claim terms "25 mg," "25 to 75 mg," and "7.37-22.1 mg" in the prior litigation. *See Shire LLC v. Amneal Pharms., LLC*, 2013 WL 4045622, *11 (D.N.J. 2013). Defendant cites the Court's opinion in support of its proposed construction. However, the Court's opinion does not use the word "precisely" with respect to this claim term. Rather, consistent with Takeda's proposed construction, the Court's opinion states only that "these terms are unambiguous and have their ordinary meaning."

* * *

79. I reserve the right to supplement and/or amend my declaration as appropriate.

I declare under penalty of perjury that the foregoing and the contents and opinions expressed in my written declaration, to the best of my knowledge, are true and correct.

Dated: July 27, 2021 ________________________________
Leonard J. Chyall, Ph.D.

# APPENDIX A

# Leonard J. Chyall, Ph.D.

Chyall Pharma, 1281 Win Hentschel Blvd, West Lafayette, Indiana 47906 USA
Tel 765.237.3391 (office); Tel 765.413.3207 (mobile)

## Education

B.A. (Chemistry), 1986, Oberlin College, Oberlin, OH
Ph.D. (Chemistry), 1991, University of Minnesota, Minneapolis, MN
Postdoctoral Fellow, 1992-1996, Purdue University, West Lafayette, IN
Pharmaceutical Solids and Regulatory Affairs Short Course, Purdue University, 2001

## Employment

**May 2011 –** **Chyall Pharmaceutical Consulting, LLC; West Lafayette, Indiana**
**President and Consultant**
Independent consultant serving the pharmaceutical industry. Expertise in synthetic chemistry, and analytical testing of drug substances and drug products. Services directed toward scientific data and document review, laboratory testing, and technical assistance with IP matters.

**June 2020 – Sept 2020** **Purdue University; West Lafayette, Indiana**
**Lecturer – Department of Chemistry**
Teaching responsibilities include introductory organic chemistry courses offered to undergraduate life sciences majors.

**2000-2011** **Aptuit, Inc. (formerly SSCI, Inc.), West Lafayette, Indiana**
**Director (August 2010 – May 2011)**
**Principal (January 2007 – July 2010)**
**Senior Research Investigator (2003 - 2006)**
**Research Investigator (2000 - 2003)**
Project manager and group leader for external client projects involving various aspects of organic and analytical chemistry. Projects involved new product developments (primarily pharmaceuticals) or providing scientific consulting to support patent litigation and counterfeit/-tampering analysis. Department leader responsible for fee-for-service laboratory testing and consulting services. Responsible for business development, client relations, and strategic planning of the business. Administrative supervisor for numerous chemists throughout my tenure with the company.

**1996-2000** **Great Lakes Chemical (now Chemtura), West Lafayette, Indiana**
**Research Chemist**
Lead Scientist for a new technology development program in the GLCC Corporate R&D division. Technology Coordinator for contract research programs. Project Leader for a new product development project in GLCC Polymer Additives R&D.

## Representative Technical Skills

### Analytical Chemistry

- Mass Spectrometry
  - Triple Quadrupole Systems
  - Ion Cyclotron Resonance MS
  - Ion-Molecule Chemistry
- Chromatography (HPLC, MPLC, TLC and preparative chromatography)
- Infrared (IR) and Raman Spectrometry
- NMR spectroscopy
- Spectrophotometry
- Solubility and dissolution testing
  - USP dissolution testing
  - Intrinsic dissolution rate studies
- Powder dissolution testing
- pH measurements
- Potentiometric titrations
- Karl Fischer titration

### Organic Chemistry

- Synthetic chemistry
  - mg to kg scale laboratory reactions
  - high pressure reactions
  - air-sensitive procedures
- Crystallization methods
- Enantiomer resolutions
- Polymorph, salt and cocrystal screening and characterization

### Solid Form Analytical Techniques

- X-ray powder diffraction (XRPD)
- Thermogravimetric analyses (TGA)
- Differential scanning calorimetry (DSC)
- Optical microscopy
- Moisture sorption/desorption analyses

## Professional Affiliations and Activities

- American Chemical Society
- American Association of Pharmaceutical Scientists
- Purdue Research Park Life Sciences Executive Council
- Guest Lecturer, Chemistry Department, Purdue University (Undergraduate Organic Chemistry Courses) 2016 – 2017.

## Publications

1. Chyall, L, J. Current Applications of X-Ray Powder Diffraction in the Pharmaceutical Industry *Am. Pharm. Rev.* **2012**, *15*, 70-73.
2. Park, A.; Chyall, L.; Dunlap, J.; Schertz, C.; Jonaitis, D.; Stahly, B.; Bates, S.; Shipplett, R.; Childs S. New solid-state chemistry technologies to bring better drugs to market: knowledge-based decision making. *Exp. Opin. Drug Disc.*, **2007**, *2(1)*, 145-154.
3. Lohani, S.; Zhang, Y.; Chyall, L. J.; Mougin-Andres, P.; Muller, F. X.; Grant, D. J. W. Carbamazepine-2,2,2-trifluoroethanol (1/1). *Acta Cryst.* **2005**, *E61*, 1310-1312.
4. Childs, S. L.; Chyall L. J.; Dunlap, J. T.; Smolenskaya, V. N.; Stahly B. C.; Stahly, G. P. Crystal Engineering Approach to Forming Cocrystals of Amine Hydrochlorides with Organic Acids. Molecular Complexes of Fluoxetine Hydrochloride with Benzoic, Succinic, and Fumaric Acids. *J. Am. Chem. Soc.* **2004**, 126, 13335-13342.

5. Childs, S. L.; Chyall L. J.; Dunlap, J. T.; Coates, D. A.; Stahly B. C.; Stahly, G. P. A Metastable Polymorph of Metformin Hydrochloride: Isolation and Characterization Using Capillary Crystallization and Thermal Microscopy Techniques. *Crystal Growth & Design* **2004**, *4*, 441-449.
6. Chyall, L. J.; Tower, J. M.; Coates, D. A.; Houston, T. L.; Childs, S. L. Polymorph Generation in Capillary Spaces: The Preparation and Structural Analysis of a Metastable Polymorph of Nabumetone. *Crystal Growth & Design* **2002**, *2*, 505-510.
7. Morgan, A. B.; Harris, R. H., Jr.; Kashiwagi, T.; Chyall, L. J.; Gilman, J. W. Flammability of polystyrene layered silicate (clay) nanocomposites: Carbonaceous char formation. *Fire and Materials* **2002**, *26*, 247-253.
8. Hill, B. T.; Poutsma, J. C.; Chyall, L. J.; Hu, J.; Squires, R. R. Distonic ions of the "Ate" class. *J. Am. Soc. Mass Spectrom.* **1999**, *10(9)*, 896-906.
9. Gassman, P. G.; Han, S.; Chyall, L. J. Thermal rearrangement of trans-7,7-dihalobicyclo[4.1.0]hept-3-enes. *Tetrahedron Lett.* **1998**, *39(31)*, 5459-5462.
10. Poutsma, J. C.; Seburg, R. A.; Chyall, L. J.; Sunderlin, L. S.; Hill, B. T.; Hu, J.; Squires, R. R. Combining Electrospray Ionization and the Flowing Afterglow Method. *Rapid Commun. Mass Spectrom.* **1997**, *11*, 489-493.
11. Chyall, L. J.; Squires, R. R. The Proton Affinity and Absolute Heat of Formation of Trifluoromethanol. *J. Phys. Chem.* **1996**, *100*, 16435-16440.
12. Leeck, D. T.; Li, R.; Chyall, L. J.; Kenttämaa, H. I. Homolytic Se-H Bond Energy and Ionization Energy of Benzeneselenol, and the Acidity of the Corresponding Radical Cation. *J. Phys. Chem.* **1996**, *100*, 6608-6611.
13. Chyall, L. J.; Squires, R. R. Determination of the proton affinity and absolute heat of formation of cyclopropenylidene. *Int. J. Mass Spectrom. Ion Processes* **1995**, *149/150*, 257-266.
14. Smith, R. L.; Chyall, L. J.; Beasley, B. J.; Kenttämaa, H. I. The Site of Protonation of Aniline. *J. Am. Chem. Soc.* **1995**, *117*, 7971-7973.
15. Chou, P. K.; Smith, R. L.; Chyall, L. J.; Kenttämaa, H. I. Reactivity of the Prototype Organosulfur Distonic Ion: $^{\bullet}CH_2SH_2^+$ *J. Am. Chem. Soc.* **1995**, *117*, 4374-4378.
16. Chyall, L. J.; Kenttämaa, H. I. Gas-phase reactions of the 4-dehydroanilinium ion and its isomers. *J. Mass Spectrom.* **1995**, *30*, 81-87.
17. Chyall, L. J.; Byrd, M. H. C.; Kenttämaa, H. I. Reactions of the Charged Radical $(CH_3)_2S^+$-$CH_2^{\bullet}$ with Cyclic Alkenes. *J. Am. Chem. Soc.* **1994**, *116*, 10767-10772.
18. Chyall, L. J.; Brickhouse, M. D.; Schnute, M. E.; Squires, R. R. Kinetic versus Thermodynamic Control in the Deprotonation of Unsymmetrical Ketones in the Gas Phase. *J. Am. Chem. Soc.* **1994**, *116*, 8681-8690.
19. Chyall, L. J.; Kenttämaa, H. I. The 4-Dehydroanilinium Ion: a Stable Distonic Isomer of Ionized Aniline. *J. Am. Chem. Soc.* **1994**, *116*, 3135-3136.

20. Smith, R. L.; Chyall, L. J.; Stirk, K. M.; Kenttämaa, H. I. Radical-type reactivity of the methylenedimethylsulfonium ion, $(CH_3)_2S^+\text{-}CH_2^\bullet$ *Org. Mass Spectrom*. **1993**, *28*, 1623-1631.
21. Smith, R. L.; Chyall, L. J.; Chou, P. K.; Kenttämaa, H. I. The Acyclic Distonic Isomer of Ionized Cyclopentanone: $^\bullet CH_2CH_2CH_2CH_2CO^+$ *J. Am. Chem. Soc.* **1994**, *116*, 781-782.
22. Mlinaric-Majerski, K.; Vinkovic, V.; Chyall, L. J.; Gassman, P. G. Deuterium isotope effects on nuclear shielding. Cross-ring effects in rigid cyclic molecules. *Magn. Reson. Chem.* **1993**, *31*, 903-905.
23. Brickhouse, M. D.; Chyall, L. J.; Sunderlin, L. S.; Squires, R. R. Kinetics of isobaric ion/molecule reactions determined by the flowing afterglow-triple quadrupole technique. *Rapid Commun. Mass Spectrom.* **1993**, *7*, 383-3

## Patents

1. Gushurst, K. S.; Chyall, L. J.; Koztecki, L. H.; Wolfe, B. S. Crystalline forms of oxymorphone hydrochloride US 8,563,571 (October 22, 2013).
2. Quigley, K. A.; Still, E. J.; Chyall, L. J. 4-[3[(4-Cyclopropanecarbonyl-piperazine-1-carbonyl-4-fluorobenzyl]-2H-phthalazin-1-one. US 8,183,369 B2 (May 22, 2012).
3. Chyall, L. J.; Hodgen, H. A.; Vyverberg, F. J.; Chapman, R. W. Intumescent Polymer Compositions. US 6,905,693 (June 14, 2005).
4. Chyall, L. J.; Hodgen, H. A.; Vyverberg, F. J.; Chapman, R. W.; Chou, P. K. Intumescent Polymer Compositions. US 6,632,442 B1 (October 14, 2003).
5. Robin, M. L.; Mazac, C. J.; Chyall, L. J.; Kleindl, P. Bromine-containing 1,2-bis(phenyl)difluoromethanes and method of imparting flame retardancy to flammable materials. US 6,348,633 (February 19, 2002).

## Papers Presented

1. "Crystallization Studies of Nabumetone: Preparation and Characterization of a Novel, High-Energy Polymorph." Chyall, L. J.; Tower, J. M.; Coates, D. A.; Houston, T. L., 223rd National Meeting of the American Chemical Society, Orlando, FL, April 7-11, 2002: Abstract IEC 268
2. "The Synthesis and Properties of 7,7-Dichloro-*trans*-bicyclo-[4.1.0]-hept-3-ene." P. G. Gassman and L. J. Chyall, 22nd Great Lakes Regional Meeting of the American Chemical Society, Duluth, MN, May 31-June 2, 1989: Abstract 98.
3. "The Synthesis and Thermal Isomerization of 7,7-Dihalo-*trans*-bicyclo-[4.1.0]-hept-3-enes." P. G. Gassman and L. J. Chyall, 201st National Meeting of the American Chemical Society, Atlanta, GA, April 14-19, 1991: Abstract ORGN 228.

4. "Free Radical Rearrangements of Dihalo-*trans*-bicyclo-[4.1.0]-hept-3-enes." P. G. Gassman and L. J. Chyall, 32nd National Organic Chemistry Symposium, University of Minnesota, Minneapolis, MN, June 16-20, 1991: Abstract B-65.
5. "Kinetic Versus Equilibrium Control in the Deprotonation of Unsymmetrical Ketones in the Gas Phase." L. J. Chyall, M. D. Brickhouse, M. E. Schnute, and R. R. Squires, 205th National Meeting of the American Chemical Society, Denver, CO, March 28-April 2, 1993: Abstract ORGN 29.
6. "Ion-Molecule Chemistry of the Methylene Dimethylsulfonium Ion: A Novel Alpha-Distonic Ion." L. J. Chyall, R. L. Smith, K. M Stirk, and H. I Kenttämaa, 41st ASMS Conference on Mass Spectrometry, San Francisco, CA, May 30-June 4, 1993: Abstract MOD 12:10
7. "Radical-Type Reactivity of Distonic Ions: The 4-Dehydroanilinium Ion." L. J. Chyall and H. I Kenttämaa, 208th National Meeting of the American Chemical Society, Washington, DC, August 21-25, 1994: Abstract ORGN 404.
8. "Astrophysical Thermochemistry: The Heats of Formation of $C_3H_2$ Isomers." L. J. Chyall and R. R. Squires, 43rd ASMS Conference on Mass Spectrometry, Atlanta, GA, May 21-26, 1995: Abstract WOE 11:50.

## Invited Lectures

1. "Environmentally Friendly Fire Suppression Technology." Department of Chemistry, Purdue University, West Lafayette, IN. April 8, 1997.
2. "The Proton Affinity and Absolute Heat of Formation of Trifluoromethanol." Joint Institute Laboratory for Astrophysics, University of Colorado, Boulder, CO. March 1, 1996.
3. "Understanding the Atmospheric Fate of Hydrofluorocarbons: Thermochemisty of Trifluoromethanol." Aeronomy Laboratory, National Oceanic and Atmospheric Administration, Boulder, CO. February 29, 1996.

## Dissertation

Chyall, L. J. The synthesis and thermal rearrangements of 7,7-dibromo-*trans*-bicyclo[4.1.0]hept-3-ene and 7,7-dichloro-*trans*-bicyclo[4.1.0]hept-3-ene. (1991) 192 pp. Avail.: Univ. Microfilms Int., Order No. DA9209417 From: Diss. Abstr. Int. B 1992, 52(10), 5264.

# APPENDIX B

**Materials Reviewed by Dr. Leonard Chyall**

1. Joint Claim Construction Statement
2. The parties' L. Pat. R. 4.1(a) exchanges (Apr. 20, 2021)
3. The parties' L. Pat. R. 4.2 exchanges (May 11, 2021), (May 25, 2021)
4. Exhibits 1-18,[1] TAKVYV01700000-1701931
5. Exhibits 19-36, TAKVYV01702115-1737939
6. Exhibit 37
7. Exhibit 42, TAKVYV01743210-1743214
8. Exhibit 45, NPILDX_000000129-159
9. Exhibit 46, TAKVYV01745249-1745254
10. Exhibit 47, NPILDX_000000583-602
11. Exhibit 48, NPILDX_000000427-504
12. Exhibits 49-55, NPILDX_000002746-2794
13. Exhibit 56
14. Exhibit 57, NORWICH_LDX_000003778-3843
15. Exhibit 58
16. TAKVYV00001948-37416

[1] Unless otherwise stated, the exhibits referenced herein are exhibits attached to the Declaration of Andrew S. Roper, Esq. in Support of Plaintiff Takeda's Opening Claim Construction Brief dated July 27, 2021.